## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GreenHouse International, LLC

        Plaintiff,

    v.

Moulton Logistics Management, Inc.

        Defendant.

C.A. No.

**JURY TRIAL DEMANDED**

## COMPLAINT

For its Complaint, plaintiff GreenHouse International, LLC alleges as follows:

## THE PARTIES

1.      Plaintiff GreenHouse International, LLC ("Plaintiff") is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 300 Creek View Road, Suite 101, Newark, DE 19711.

2.      Upon information and belief, defendant Moulton Logistics Management, Inc. ("Defendant") is a corporation organized under the laws of the State of California with its principal place of business at 7850 Ruffner Avenue, Van Nuys, CA 91406.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, 1337, and 1367 because the matter in controversy: (i) exceeds $75,000, exclusive of interest and costs, and is between citizens of different states; and (ii) arises under the Lanham Act, 15 U.S.C. § 1125.

4.      Venue is proper in this district under 28 U.S.C. §§ 1391 (b), (c), because: (i) Defendant entered into a contract to transact substantial business within this judicial district, which forms a substantial part of the claims herein; and (ii) Defendant is in the business of shipping substantial volumes of products into interstate commerce, including into this judicial district.   This Court has personal jurisdiction over Defendant because Defendant transacts business within this district and the State of Delaware.

## GENERAL ALLEGATIONS

### Plaintiff's Business

5.      Plaintiff conducts research, and develops and markets unique and highly effective consumer products primarily in the health and fitness industry.   Plaintiff's most well known product is the Bean®, selling over one million units since its launch in 2004.  The Bean® is sold through various channels including retail chain stores such as Wal-Mart, JC Penney, Target, QVC, and Dick's Sporting Goods.

6.      The Bean® is also sold directly to consumers through direct response marketing. Upon information and belief, it is one of the most popular fitness products sold through direct response advertising.  Customers view an infomercial or commercial, hear a radio advertisement, see a print advertisement, or view one of Plaintiff's websites, and then place orders by calling an 800 telephone number or ordering online through a website.

7.      Plaintiff utilizes logistics management and fulfillment services companies to assist the administration of its wholesale, retail, and direct response sales and customer support for the Bean® and other products.

2

<u>Plaintiff's Relationship with Defendant</u>

8.    Plaintiff and Defendant entered into a Fulfillment Services Agreement effective July 1, 2006 ("Agreement").

9.    According to the Agreement, Defendant was to provide services to Plaintiff in the area of logistics and inventory management, whereby Defendant would receive orders and update customer information from Client's multiple sources.

10.    The Agreement further detailed various processing and shipping requirements with an attached fee schedule, which included the provision that Defendant would process all available orders, generate batch reports, packing slips, shipping labels and ship product. Defendant was also required to provide backend customer service for calls pertaining to shipping information, refunds and standard customer service questions.

11.    The Agreement also specified that Defendant would support online access to inventory database via internet connection from Plaintiff's location.  This database of customer information (hereinafter "Database") includes a compilation, in electronic format, of all of Plaintiff's customer and sales information, including but not limited to:

(i)    customer names
(ii)    customer addresses
(iii)    customer telephone numbers
(iv)    customer credit card, debit card, or check information
(v)    how and when customers placed orders for the product
(vi)    whether customers ordered products by payment in full or a scheduled series of payments (referred to as "multi-pay")
(vii)    how and when the customers orders were fulfilled
(viii)    customer service calls received, including customer comments, complaints, questions and/or requests
(ix)    credit card, debit card or check processing or declines by financial institutions
(x)    refunds, returns and replacement products
(xi)    warranty claims
(xii)    outstanding order status
(xiii)    injury reports

3

(xiv)  bad debts on multi-pay (installment) transactions
(xv)   inventory
(xvi)  defective products
(xvii) customer email addresses

12.    Defendant was responsible for the continuous updating, maintenance and storage of the Database.  Under the Agreement, the Database was Plaintiff's property which would be hosted by Defendant in order to provide access for clients.  The Database is one of the most essential assets owned by Plaintiff.  Plaintiff was required to have complete access to the Database in order to properly manage and operate its business, and Defendant was aware of Plaintiff's requirement and need.

13.    On May 21, 2007, in accordance with the terms of the Agreement, Plaintiff advised Defendant in writing that the Agreement was terminated because of Defendant's poor performance, including, but not limited to, Defendant's failure to resolve wholesale sales charge-backs, and deficient and unsatisfactory customer service performance.  Plaintiff further advised Defendant that  Accretive Commerce, Inc. ("Accretive"), one of Defendant's main competitors, would provide future fulfillment services to Plaintiff, and requested Defendant to transition Plaintiff's information to Accretive, as provided by the Agreement.

14.    Prior to July 6, 2007, Defendant provided Plaintiff access to its Database, by means of a website portal operated by Defendant and referred to as a "dashboard" (www.MoultonLogistics.com and others), in addition to phone consultations with various Defendant employees.

15.    It is industry standard and custom that Order Comments are an included and essential component of a Database and that the information, together with the remainder of the Database, is the property of the client, in this case, the Plaintiff.  Order Comments include, *inter alia*, critical customer information relating to customer returns, complaint, order history, refunds

and replacements.  The Order Comments are necessary to properly manage and service pending customer orders and other essential transactions with Plaintiff's customers.  Prior to Plaintiff's termination, Defendant had consistently and continuously provided full access to Order Comments to Plaintiff.  Defendant knew at all times relevant hereto that Plaintiff and Accretive would not be able to properly manage and service pending customer orders and other essential transactions without these Order Comments.

16.    Beginning July 6, 2007, however, Defendant has refused Plaintiff complete access to its Database, and has refused to transition to Plaintiff or Accretive essential portions of the Database, including the "Order Comments."

17.    Upon information and belief, Defendant refuses to provide Order Comments to Plaintiff or Accretive in order to harm Plaintiff's business and reputation, and prevent Plaintiff from properly conducting transactions with its customers.

18.    Plaintiff has suffered severe harm from Defendant's failure to ressporg the Order Comments to Plaintiff.  For example, customers have cancelled pending purchases of Plaintiff's products because Plaintiff cannot respond to client inquiries without the information contained in the Order Comments.  Governmental and quasi-governmental entities have filed complaints against Plaintiff because Defendant has withheld Order Comments from Plaintiff which Plaintiff needs in order to respond to customer complaints.  Further, Plaintiff, via Accretive, has received pallets of returned products, which Defendant did not process or properly log within the Database.  Without the Order Comments, Plaintiff is unable to determine why the products were returned, what the customer is requesting (i.e. a refund or a replacement unit), and in numerous instances the identification of the customer who returned the product.

19.     Plaintiff is losing good-will because customers are unsatisfied with Plaintiff and its customer service because Plaintiff cannot identify and effectively communicate with customers without the Order Comment, and Plaintiff's reputation has been significantly damaged because of Defendant's misconduct.

20.     On or about August 13, 2007, Plaintiff emailed Defendant's attorney, Michael S. Wildermuth, Esquire, requesting that Mr. Wildermuth convince Defendant to release the essential Order Comments to Plaintiff.  On August 14, 2007, Mr. Wildermuth responded that Defendant would release Plaintiff's Order Comment and other Database information only if Plaintiff executed a full release of all claims Plaintiff had against Defendant.  Plaintiff refused Defendant's coercion, and Defendant has yet to transition Order Comments and the remainder of Plaintiff's Database to Plaintiff.

<u>Freight and Shipping Charges</u>

21.     A substantial portion of Plaintiff's sales are direct response sales as described above.  Pursuant to the Agreement, direct response product orders were communicated to Defendant for fulfillment.  In fulfilling the direct response orders, Defendant shipped the product directly to the customer at the customer's specified address.  Pursuant to the Agreement, Defendant was permitted to charge-back to Plaintiff only the actual shipping costs.

22.     In March 2007, Plaintiff and Defendant re-negotiated the Agreement, and Defendant represented to Plaintiff that it had requested and secured better shipping rates from its freight carriers.

23.     These new shipping rates were represented by Defendant to Plaintiff as the "NEW Smart Post Rates," a shipping service provided by FedEx SmartPost, Inc., a subsidiary of FedEx Corporation, and which was utilized by Defendant for Plaintiff.

24.     FEDEX SMARTPOST® is a U.S. registered service mark of Federal Express Corporation, Reg. No. 2929883.  With FEDEX SMARTPOST®, FedEx SmartPost, Inc. picks up, sorts, line hauls, tracks and delivers packages to the post offices closest to the customers. The U.S. Postal Service makes the final delivery to customer residences.  FEDEX SMARTPOST® is intended to reduce transit time, minimize handling, and maximize postal discounts (http://www.fedex.com/us/smartpost/).

25.     Defendant represented to Plaintiff, through the negotiation and execution of the April 1, 2007 Addendum to the Agreement, that the listed "NEW Smart Post Rates as of March 07" were the actual rates charged by FedEx SmartPost, Inc. for its FEDEX SMARTPOST® freight shipping services alleged by Defendant to have been secured from FedEx SmartPost, Inc. for Plaintiff.

26.     The parties executed an addendum to the Agreement on or about April 1, 2007 ("Addendum"), which listed the new rates as "NEW Smart Post Rates as of March 07."

27.     Upon information and belief, contrary to the terms of the Agreement and its representations to Plaintiff, Defendant charged-back to Plaintiff shipping costs in excess of the FEDEX SMARTPOST® Rates charged by FedEx SmartPost, Inc., which were the only chargebacks allowed by the Agreement, without disclosing that Defendant was adding upcharges to the allowed FEDEX SMARTPOST® costs.

28.     Upon information and belief, Defendant intentionally and deceptively misrepresented the actual FEDEX SMARTPOST® rates secured by Defendant for shipment of Plaintiff's products in order to defraud Plaintiff.

Retail Charge-Backs

29.    As noted above, a portion of Plaintiff's products are sold to retail stores, which in turn resell the products to their customers (hereinafter "Retailers"). Plaintiff refers to its product sales to Retailers as "wholesale sales."

30.    Pursuant to the Agreement, Defendant was responsible for packing and making all purchase orders from Retailers ready for shipment. Defendant obtained the Agreement based on its representation of quality and expertise in the area, and the Agreement contemplated that Defendant would perform its duties in a proper and reasonable manner.

31.    When product is sold to Retailers, a manual of proper procedures, provided to Defendant by each Retailer, must be followed in order for the Retailers to accept product shipments. Defendant was obliged to follow such proper procedures. Nevertheless, Defendant failed to comply with published Retailer instructions on numerous occasions to several different Retailers.

32.    Retailers often accept non-conforming product shipments, but will assess charges to the seller called "charge-backs." Charge-backs by Retailers related to non-conforming shipments, including but not limited to improper documentation, improper preparation for shipment, and damage to products during packing.

33.    Plaintiff was chargedback in excess of $100,000.00 for improper shipments caused by Defendant's failure to properly and reasonably comply with its duties under the Agreement.

34.    Defendant knew or should have known that Plaintiff was being assessed the charge-backs referenced herein. Defendant consistently acknowledged the charge-backs and problems, and informed Plaintiff that it would remedy the situation, but failed and or refused to do so.

## Transition to Accretive

35.    The Agreement provided that upon its termination, there would be a transition phase whereby Plaintiff would resume control of its operations directly or by moving the services to another fulfillment company.  During that period, many of the parties' mutual rights and obligations continued, including, but not limited to, those services listed in paragraphs 3-7 of the Agreement.  In addition, paragraph 14c of the Agreement required Defendant to prepare a memo outlining the procedure for closing Plaintiff's account.

36.    Defendant required and retained a deposit from Plaintiff for the aforesaid transition phase services.    Nevertheless, Defendant failed to comply with the transition provisions of the Agreement.  For example, Defendant did not prepare or deliver to Plaintiff the required transition memo or outline the procedure for closing Plaintiff's account; failed to fulfill direct response and wholesale orders; failed to process payments or invoices for orders; failed to allow Plaintiff access to its Database; failed to allow Plaintiff access to Defendant's website; failed to accept customer service calls or inquiries; failed to process product returns for credit or replacement; failed to communicate with Plaintiff on key fulfillment issues; failed to process Electronic Data Interchange ("EDI") transactions; and refused delivery of returns from customers.

37.    Defendant intentionally, willfully and/or wantonly, or with gross negligence, packed the last container of product and other materials belonging to Plaintiff and bound for Accretive in such a manner as to damage the contents of the container which caused Accretive to surcharge Plaintiff to unload and repair the products and materials and caused dock delays for Accretive in picking up its inventory which added waiting time charges to Plaintiff.  Defendant also improperly sent Accretive's drivers away in one instance.  It is industry custom that

appointments are made at the dock for pickup, which custom Accretive followed, but was still denied timely access to Plaintiff's inventory.

Improper Denial of Services for<br>Alleged Non-Payment of Outstanding Invoices

38.    On July 6, 2007, Defendant alleged by email that Plaintiff's account was past due, and that all services would be suspended until payment was made.  Approximately one hour after the email notice, Plaintiff's 800 customer service telephone numbers were disconnected, access to Defendant's website was denied, and Defendant employees refused to assist Plaintiff employees with any business matters whatsoever.

39.    Plaintiff notified Defendant prior to and at that time that there were disputed charges in excess of the amount Defendant claimed was due.

40.    Plaintiff further wired partial payment, and submitted post-dated checks to Defendant for payment of the disputed charges, which offer Defendant accepted, including accepting partial payment subject to said accord, but still refused Plaintiff the services to be performed pursuant to the Agreement.

41.    Defendant breached the Agreement by: (i)  failing to provide proper notice that it was going to suspend all services to Plaintiff, and denying Plaintiff access to its assets; (ii) improperly denying Plaintiff access to 800 customer service telephone numbers, which were required for Plaintiff to operate its business, and not allowing Plaintiff to restore the 800 numbers it owned so that it could receive calls from its existing customers; (iii)  denying Plaintiff access to its Database; (iv)  failing to ship product or otherwise perform pursuant to the Agreement; (v) failing to process multi-pay transactions, resulting in bad debt; and (vi)  failing to allow Plaintiff access to Defendant's website, which contained Plaintiff's database and other essential information necessary for Plaintiff to conduct business.

10

Failure to Properly Submit EDI
Transactions for Payments from Retailers

42.    Retail sellers utilize a system called Electronic Data Interchange ("EDI"), an inter-company, application-to-application communication of data in standard format for business transactions, whereby purchase orders are sent and invoices received by electronic means.

43.    Defendant charged Plaintiff to setup EDI transactions by Defendant on behalf of Plaintiff.  The standard practice in the fulfillment of wholesale orders is to invoice the Retailer through the EDI system for purchase orders for shipped products.   Under the Agreement, Defendant was responsible for coordinating operations for third parties as necessary to receive orders for processing, and agreed to exercise best efforts to fulfill all orders.

44.    Defendant breached its obligations to properly process EDI transactions for Plaintiff, because Defendant either completely failed to process or send invoices through the EDI system, or did so improperly by *inter alia*, failing to keep EDI identification numbers valid and active, failing to enter terms of payment, and failing to enter required UPC information.

45.    As a direct and proximate result of Defendant's failure to properly process EDI transactions, Plaintiff was not timely paid for a substantial number of retail purchase orders, amounting to more than $150,000.00, some of which Plaintiff still has not been paid for at all, and some of which have resulted in retail chargeback costs to Plaintiff.

46.    As a further direct and proximate result of Defendant's breaches, the time limit within which an EDI transaction can be submitted passed, and each of the aforementioned purchase orders must be manually transmitted to each Retailer, which necessitates a fee for each invoice submitted, delay in delivery of funds, and many hours of employee time.

Failure to Provide Accounting or Return Deposit Funds

11

47.    Defendant required a freight deposit as well as a deposit for winding-down the Agreement.

48.    Upon information and belief, a surplus balance remains in those deposit accounts.

49.    Plaintiff has demanded an accounting for said funds on several separate occasions, but Defendant has refused to provide Plaintiff with information regarding these funds.

<u>Multi-Pay Transactions</u>

50.    For Plaintiff's direct response sales to customers, Plaintiff offers the option to pay for the product in a series of credit card transactions, called "multi-pay" transactions, instead of paying in one lump sum.

51.    Defendant was responsible for the maintenance, accounting and initiation of processing of these transactions, and was to provide Plaintiff with an ongoing status report, including sales, pending transaction amounts, bad debts, and other key information.

52.    Defendant continually failed and/or refused to reconcile or provide a reconciliation of the multi-pay transactions

53.    As a direct result of Defendant's failure to properly manage multi-pay transactions, Plaintiff lost substantial revenue, as it did not receive many of the transactional payments due from these customers.

## <u>COUNT I – MISAPPROPRIATION OF TRADE SECRETS</u>

54.    Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-53 of this Complaint.

55.    The Database has independent economic value to others because, *inter alia*, the information can be used for marketing purposes.    The Database constitutes confidential

information that has been securely maintained for Plaintiff by Defendant, and is Plaintiff's trade secret as defined by 6 Del. C. § 2001(4).

56.   Defendant continues to deny Plaintiff or its agent complete access to the Database.

57.   Defendant improperly asserts ownership of the Database, including at least the Order Comments, and Defendant's declaration that it owns the Order Comment component signifies Defendants intent to use the Database without authorization.

58.   Defendant's manipulation of the Database to deny Plaintiff access to the entire Database and to the specific Order Comment component of the Database constitutes unauthorized use of the Database.

59.   By exerting dominion over, and refusing access to, the Database, Defendant has misappropriated Plaintiff's trade secrets in the Database, and all the above uses by Defendant constitute misappropriation under 6 Del. C. § 2001(2)(b).

60.   Plaintiff has suffered and will continue to suffer economic harm until Defendant is ordered to provide the full Database to Plaintiff's agent and Defendant is enjoined from any further unauthorized use of the Database.

61.   Defendant's misappropriation was a willful and malicious effort to knowingly cause significant economic harm to Plaintiff, therefore warranting enhanced damages under 6 Del. C. § 2003(b).

## COUNT II – REPLEVIN

62.   Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-61 of this Complaint.

63.   Defendant no longer has Plaintiff's authority to posses and utilize the Database.

64.     Defendant refuses to provide the Database to Plaintiff or its agent, despite Plaintiff's demand.

65.     Defendant's wrongful possession of the Database denies Plaintiff its right to possess and utilize the Database.

66.     Plaintiff is entitled to possession of the entire contents of its Database, and for damages for failure to timely and properly provide the Database to Plaintiff.

## COUNT III – CONVERSION

67.     Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-66 of this Complaint.

68.     Defendant no longer has Plaintiff's authority to posses or utilize the Database.

69.     Defendant refuses to provide the Database to Plaintiff or its agent, despite Plaintiff's demand, and thus has deprived Plaintiff of possession and has converted the Database.

70.     Plaintiff is entitled to possession of the entire contents of its Database, and to damages for its wrongful conversion.

## COUNT III – TORTIOUS INTERFERENCE

71.     Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-70 of this Complaint.

72.     Plaintiff has valid business relationships and expectancies with respect to the specific customers presently identifiable only from the Database.

73.     Defendant has direct knowledge of these relationships and expectancies, including that the Database was Plaintiff's primary source, and in most instances the only source, of information for all aspects of these relationships and expectancies.

14

74.     Defendant intentionally interfered with these relationships and expectancies by refusing to provide to Plaintiff or its agents access to any part of the Database from July 6, 2007 to July 20, 2007, and by terminating access to the "800" number.

75.     Defendant intentionally interfered and continues to interfere with these relationships and expectancies by refusing to provide to Plaintiff or its agents access to the Order Comment Component of the Database since July 6, 2007 and to the present.

76.     Defendant did not and does not have a valid justification for refusing to provide to Plaintiff or its agents access to the Database or any component thereof.

77.     Defendant's wrongful withholding of the Database, and components thereof, from Plaintiff or it agents crippled Plaintiff's ability to (i) collect revenue on completed product sales for transactions occurring before the transition to Accretive; (ii) provide replacement products requested before the transition to Accretive; (iii) satisfy other customer requests made before the transition to Accretive; and (iv) address customer complaints made before the transition to Accretive, all of which are only identifiable to Plaintiff through the Database currently.

78.     Defendant's intentional interference was intended to harm Plaintiff and was accomplished through the use of improper, unauthorized means that in fact harmed Plaintiff.

79.     Defendant's interference has damaged Plaintiff in an amount to be determined at trial.

### COUNT IV – LANHAM ACT – 15 U.S.C. § 1125(a)(1)(A)

80.     Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-79 of this Complaint.

81.     Defendant intentionally misled Plaintiff, through the negotiation and execution of the April 1, 2007 Addendum to the Agreement, that the listed "NEW Smart Post Rates as of

15

March 07" were the actual rates charged by FedEx Corporation for its FEDEX SMARTPOST®

freight shipping services alleged by Defendant to have been secured from FedEx Corporation for

Plaintiff.

82.     Upon information and belief, these referenced rates are not the actual FEDEX

SMARTPOST® rates charged by FedEx SmartPost, Inc., but instead are higher rates Defendant

deceptively marked up to profit at Plaintiff's expense ("Upcharged SmartPost Rates").

83.     Defendants representation of the Upcharged SmartPost Rates as the actual

FEDEX SMARTPOST® rates constitutes a deceptive trade practice under 15 U.S.C. § 1125(a).

84.     Damages to be awarded to Plaintiff for Defendant's deceptive conduct should be

trebled pursuant to 6 Del. C. § 2533(c), and costs and attorneys' fees should be awarded Plaintiff

pursuant to 6 Del. C. § 2533(b) because Defendant's deceptive conduct was willful.

## COUNT IV – DECEPTIVE AND UNFAIR
## TRADE PRACTICES ACT - 6 DEL. C. § 2532

85.     Plaintiff realleges and incorporates herein by reference the allegations stated in

paragraphs 1-84 of this Complaint.

86.     Defendants misrepresentation of the Upcharged SmartPost Rates as the actual

FEDEX SMARTPOST® rates constitutes a deceptive trade practice under 6 Del. C. § 2532(a).

87.     Damages to be awarded to Plaintiff for Defendant's deceptive conduct should be

trebled pursuant to 6 Del. C. § 2533(c), and costs and attorneys fees should be awarded Plaintiff

pursuant to 6 Del. C. § 2533(b) because Defendant's deceptive conduct was willful.

## COUNT V – BREACH OF CONTRACT – FREIGHT CHARGES

88.    Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-87 of this Complaint.

89.    The Agreement required Defendant to pass through all freight charges incurred by Defendant on behalf of Plaintiff as accessorial charges without markup by Defendant.

90.    Defendant further owed Plaintiff an obligation of good faith and fair dealing, which included not deceptively manipulating prices and rates under the Agreement.

91.    Defendant violated these contractual obligations by secretly marking up freight charges for the majority of products Defendant shipped for Plaintiff.

92.    Plaintiff suffered actual damages as a direct and proximate result of Defendant's actions, and Plaintiff is entitled to recover such damages from Defendant.

## COUNT VI – BREACH OF CONTRACT – CHARGE-BACKS

93.    Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-92 of this Complaint.

94.    The Agreement required Defendant to process all shipments to Retailers according to the terms and specifications required by each Retailer.

95.    Several charge-back reductions in payment to Plaintiff were the result of improperly processing of shipments to Retailers by Defendant.

96.    Defendant's improper processing of shipments to Retailers was a breach of the Agreement.

97.    Plaintiff suffered actual damages as a direct and proximate result of Defendant's actions, and Plaintiff is entitled to recover such damages from Defendant.

## COUNT VII – BREACH OF CONTRACT – DENIAL OF SERVICES

98.     Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-97 of this Complaint.

99.     The Agreement required Defendant to provide services, including, *inter alia*, 800 telephone number management, customer database access and maintenance, product order processing and shipments, processing of multi-pay transactions, and access to Moulton's client website.

100.    While the Agreement states that Defendant could suspend services for non-payment or non-current accounts, Defendant was not entitled to suspend services at any moment without proper notification to Plaintiff and without first giving Plaintiff a reasonable opportunity to cure.

101.    Plaintiff's notice to Defendant of breaches made and disputed charges accessed by Defendant further required Defendants to act in good faith to continue providing services to Plaintiff during any contested period.

102.    Defendant improperly suspended services without proper notice to Plaintiff and without allowing a reasonable period for Plaintiff to cure before suspending services.

103.    Plaintiff suffered actual damages as a direct and proximate result of Defendant's actions, and Plaintiff is entitled to recover such damages from Defendant.

## COUNT VIII – BREACH OF CONTRACT – TRANSITION

104.    Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-103 of this Complaint.

105.    Defendant breached its obligations during said transition phase by: (i) failing to prepare the required memo outlining the procedure for closing Plaintiff's account; (ii) failing to fulfill direct response and wholesale orders; (iii) failing to process payments or invoices for orders; (iv) failing to allow Plaintiff access to its Database; (v) failing to allow Plaintiff access to Defendant's website; (vi) failing to accept customer service calls or inquiries; (vii) failing to process product returns for credit or replacement; (viii) failing to communicate with Plaintiff on key fulfillment issues; (ix) failing to process EDI transactions; (x) refusing delivery of returns from customers; and (xi) otherwise failing to fulfill its obligations to Plaintiff pursuant to the Agreement.

106.    Defendant intentionally, willfully and/or wantonly, or with gross negligence, damaged to the contents of the last container it packed for Plaintiff.

107.    Defendant intentionally, willfully and/or wantonly caused Plaintiff's new fulfillment company dock delays in picking up its inventory, necessitating waiting time charges to Plaintiff, by making Accretive drivers wait for several hours at Defendant's dock, and sending Accretive's drivers away on one occasion.

108.    Plaintiff suffered actual damages as a direct and proximate result of Defendant's actions, and Plaintiff is entitled to recover such damages from Defendant.

## COUNT IX – BREACH OF CONTRACT – EDI TRANSACTIONS

109.    Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-108 of this Complaint.

110.    Defendant is obligations under the Agreement to submit EDI transactions for invoice payments from Retailers to Plaintiff.

19

111.    Defendant breached its obligations under the Agreement by failing to properly submit EDI transactions for payment from Retailers.

112.    Plaintiff suffered actual damages as a direct and proximate result of Defendant's actions, and Plaintiff is entitled to recover such damages from Defendant.

## COUNT X – BREACH OF CONTRACT – ACCOUNTING

113.    Plaintiff realleges and incorporates herein by reference the allegations stated in paragraphs 1-112 of this Complaint.

114.    Defendant breached its obligations under the Agreement by failing to provide an accounting or return Plaintiff's deposit funds.

115.    Plaintiff suffered actual damages as a direct and proximate result of Defendant's actions, and Plaintiff is entitled to recover such damages from Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that it have judgment against Defendant for the following:

(1)    A permanent injunction that Defendant:

    a.    transfer the entire Database, including the Order Comments to Plaintiff, and

    b.    enjoining and restraining Defendant and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with it, from any further use of the Database without Plaintiff's express authorization;

(2)    An award of damages;

(3)    An award of punitive damages;

(4)    An award of all costs of this action, including attorneys' fees and interest; and

(5)    Such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

**JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues appropriately triable by a jury.

**WOMBLE CARLYLE SANDRIDGE  &
RICE, PLLC**

George Pazuniak (# 478)
James M. Lennon (# 4570)
AnnaMartina L. Tyreus (# 4771)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

*Counsel for Plaintiff Greenhouse International, LLC*

Dated:  November 9 , 2007

WCSR 3769291v5

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by the Rules of Court. This form, approved by the Judicial Conference of the united States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the Civil Docket Sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFF

**GreenHouse International, LLC**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANT

**Moulton Logistics Management, Inc.**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:     IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
           TRACT OF LAND INVOLVED

**(c)** ATTORNEYS FIRM NAME, ADDRESS AND PHONE NO.

George Pazuniak
James M. Lennon
AnnaMartina Tyreus
Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION

*(PLACE AN "X" IN ONE BOX ONLY)*

☐ 1 U. S. Government
      Plaintiff

☐ 2 U.S. Government
      Defendant

[X] 3 Federal Question
      (U. S. Government Not A Party)

☐ 4 Diversity
      (Indicate Citizenship of Parties
       in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES

*(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | [X] 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN *(PLACE AN "X" IN ONE BOX ONLY)*

[X] 1 Original
      Proceeding

☐ 2 Removed from
      State Court

☐ 3 Remanded from
      Appellate Court

☐ 4 Reinstated or
      Reopened

Appeal to District
Transferred from
☐ 5 Another District
      (specify)

☐ 6 Multidistrict
      Litigation

Judge from
☐ 7 Magistrate
      Judgment

## V. NATURE OF SUIT *(PLACE AN "X" IN ONE BOX ONLY)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

*CIVIL RIGHTS*
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 366 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
   Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Other

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 443 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of InformationAct
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Lanham Act, 15 U.S.C. § 1125(a)(1)(A); 6 Del. C. § 2532

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**    CHECK YES only if demanded in complaint:

JURY DEMAND: [X] YES    ☐ NO    ☐ UNDER F.R.C.P. 23

## VIII. RELATED CASE(S) IF ANY *(See instructions)*

JUDGE _____      DOCKET NUMBER _____

DATE: November 9, 2007      SIGNATURE OF ATTORNEY OF RECORD: *James M. Lennon* (DE 4570)

---

FOR OFFICE USE ONLY

RECEIPT #_____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.   **(a) Plaintiffs-Defendants.** Enter names (last, first middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdiction be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III. **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

V.  **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.  **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers of multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
**Date and Attorney Signature.** Date and sign the civil cover sheet.

125334v1(CB)

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 07 - 722 -

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

_11-9-07_

(Date forms issued)

_Shane Handlin_

(Signature of Party or their Representative)

_Shane Handlin_

(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action