IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GREENHOUSE INTERNATIONAL, LLC,  :
                                      :
             Plaintiff,  :  C.A. No. 07-722-GMS
                                      :
      v.  :
                                        :
MOULTON LOGISTICS MANAGEMENT,  :
INC.,  :
                                      :
             Defendant.  :

**DEFENDANT'S OPENING BRIEF IN SUPPORT**
**OF ITS MOTION TO STAY PENDING ARBITRATION**

Dated: January 7, 2008

Joseph J. Bellew (#4816)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013
   *Attorneys for Defendant*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

NATURE AND STAGE OF THE PROCEEDING ..................................................................... 1

SUMMARY OF THE ARGUMENT ......................................................................................... 2

STATEMENT OF FACTS .......................................................................................................... 3

      A.   The Parties ........................................................................................................... 3

      B.   The Parties' Agreement ...................................................................................... 3

      C.   The Agreement Terminates................................................................................. 6

ARGUMENT ................................................................................................................................ 7

I.     THE FAA REQUIRES A STAY OF THIS ACTION BECAUSE PLAINTIFF'S
       CLAIMS ALL ARISE FROM OR RELATE TO AN AGREEMENT
       CONTAINING A MANDATORY ARBITRATION PROVISION ................................. 7

      A.   The Parties' Agreement Contains a Valid and Enforceable Arbitration Provision .... 8

      B.   Plaintiff's Claims All Fall Within the Scope of the Parties' Agreement ................... 8

      C.   Federal Law and Policy Favor Arbitration of the Parties' Disputes ........................ 12

II.    EVEN IF PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS NOT
       ARBITRABLE, THE COURT SHOULD EXERCISE ITS DISCRETION
       TO STAY THE REQUEST UNTIL AFTER THE ARBITRATION PANEL
       ADJUDICATES THE UNDERLYING CLAIMS ........................................................ 13

CONCLUSION.............................................................................................................................. 14

## TABLE OF AUTHORITIES

Page

CASES

*Allied Fire & Safety Equip. Co., v. Dick Enter.,*
  886 F. Supp. 491 (E.D. Pa. 1995) ............................................................13

*Appforge, Inc. v. Extended Systems, Inc.,*
  2005 WL 705341 (D. Del. Mar. 28, 2005) ......................................9, 11

*Armijo v. Prudential Ins. Co.,*
  72 F.3d 793 (10th Cir. 1995) ...................................................................12

*BAE Systems Aircraft Controls, Inc. v. Eclipse Aviation Corp.,*
  224 F.R.D. 581 (D. Del. 2004) .......................................................... 8-11

*Beck v. Reliance Steel Prods. Co.,*
  860 F.2d 576 (3d Cir. 1988)......................................................................9

*Central Jersey Freightliner Inc. v. Freightliner Corp.,*
  987 F. Supp. 289 (D.N.J. 1997) ...............................................................13

*CTF Hotel Holdings, Inc. v. Marriott Intern., Inc.,*
  381 F.3d 131 (3d Cir. 2004)......................................................................8

*Elli v. Genmab, Inc.,*
  2006 WL 2927622 (D.N.J. Oct. 12, 2006)..............................................13

*First Liberty Inv. Group v. Nicholsberg,*
  145 F.3d 647 (3d Cir. 1998)...............................................................9, 12

*First Options of Chi., Inc. v. Kaplan,*
  514 U.S. 938 (1995).................................................................................8

*Gay v. CreditInform,*
  -- F.3d --, 2007 WL 4410362 (3d Cir. Dec. 19, 2007).............................12

*Great W. Mortgage, Corp. v. Peacock,*
  110 F.3d 222 (3d Cir. 1997).....................................................................12

*Harris v. Green Tree Fin. Corp.,*
  183 F.3d 173 (3d Cir. 1999)......................................................................7

*John Hancock Mutual Life Ins. Co. v. Olick,*
  151 F.3d 132 (3d Cir. 1998)......................................................................8

*Kerr-McGee Chem., LLC v. Kemira Pigments Oy,*
   2003 WL 22299045 (D. Del. Oct. 7, 2003) ........................................................................9, 11

*Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.,*
   247 F.3d 44 (3d Cir. 2001).......................................................................................................9

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
   473 U.S. 614 (1985)..................................................................................................................7

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983)............................................................................................................... 12-13

*New Castle Cty. v. National Union Fire Ins. Co.,*
   174 F.3d 338 (3d Cir. 1999)......................................................................................................8

*Sagal v. First USA Bank, N.A.,*
   69 F. Supp. 2d 627 (D. Del. 1999)...........................................................................................7

*Sharon Steel Corp. v. Jewell Coal & Coke Co.,*
   735 F.2d 775 (3d Cir. 1984)................................................................................................9, 11

*Svedala Indus., Inc. v. Rock Engineered Machinery Co.,*
   1996 WL 590861 (E.D. Pa. Oct. 11, 1996)..............................................................................9

*Thornburg v. PAK 2000,*
   2004 WL 234650 (D. Del. Feb. 2, 2004) ...............................................................................12

*UMC Petroleum Corp. v. J & J Enterprises, Inc.,*
   758 F. Supp. 1069 (W.D. Pa. 1991).......................................................................................13


**STATUTES**

9 U.S.C. § 2...................................................................................................................................12

9 U.S.C. § 3.................................................................................................................................1, 7

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff Greenhouse International, LLC ("Plaintiff") commenced this action by filing a Complaint on November 9, 2007.  (D.I. 1).  Plaintiff's Complaint asserts twelve (12) counts against Defendant Moulton Logistics Management, Inc. ("Defendant") that all arise directly from or are related to a Fulfillment Services Agreement (the "Agreement") executed by both Plaintiff and Defendant on July 1, 2006.[1]  (Declaration of Joseph J. Bellew at ¶ 2 and Ex. A).[2]  The filing of Plaintiff's Complaint comes after more than four (4) months of time during which the parties attempted to address and amicably resolve their disputes under the Agreement.  On November 28, 2007, following receipt of Plaintiff's Complaint, Defendant's counsel delivered a letter demand for arbitration (the "Letter Demand") to Plaintiff, calling for the parties to submit all their disputes to binding, mandatory arbitration in Los Angeles, California.  (Bellew Dec. at ¶ 5 and Ex. B).

Plaintiff disagreed with the request to arbitrate and Defendant was forced to file a Petition to Compel Binding Arbitration in the Superior Court of California, in and for Los Angeles County (the "Petition to Compel").  (Bellew Dec. at ¶ 6 and Ex. C).  The Petition to Compel is currently pending and awaiting decision by the Superior Court of California.  The hearing on Defendant's Petition to Compel is currently scheduled for February 20, 2008.  (Bellew Dec. at ¶ 6).

The parties agreed that Defendant's time to answer or otherwise respond to the Complaint would be extended through and including Monday, January 7, 2008.  Pursuant to 9 U.S.C. § 3, Defendant filed a motion to stay this action pending the parties' contractually-mandated arbitration proceeding.  This is Defendant's opening brief in support of that motion.

---

[1] Despite the fact that Plaintiff's Complaint concludes with "Count X," there are a total of twelve (12) counts alleged (Counts III and IV are duplicated in error).
[2] The Declaration of Joseph J. Bellew (hereinafter, "Bellew Dec. at __") is filed contemporaneously herewith.

## SUMMARY OF THE ARGUMENT

I.     The Federal Arbitration Act ("FAA") requires that the Court stay this action as Plaintiff's claims arise from and relate to their underlying Agreement – which includes a mandatory arbitration provision requiring that the parties settle their disputes through a binding arbitration in Los Angeles, California.

II.    Alternatively, to the extent the Court determines that any one or more of Plaintiff's twelve claims do not arise from or relate to the underlying Agreement, the Court should exercise its discretion to stay those claims in favor of an arbitration that will promptly settle the majority of the disputed facts forming the basis of Plaintiff's Complaint.

## STATEMENT OF FACTS

### A.     The Parties

Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Newark, Delaware.  (Cmpt. ¶ 1). Plaintiff alleges that it conducts research, develops and markets unique and highly effective consumer products in the health and fitness industry, including The Bean®.  (Cmpt. ¶ 5). Plaintiff's products are sold through various retail establishments, including Wal-Mart, JC Penney, Target, QVC and Dick's Sporting Goods.  (Cmpt. ¶ 5).  Plaintiff also markets and attempts to sell its product through direct response marketing efforts.  (Cmpt. ¶ 6).  These efforts include infomercials, radio advertisements and print advertisements.  (*Id.*).

Defendant is a corporation organized and existing under the laws of the State of California with its principal place of business located in Van Nuys, California.  (Cmpt. ¶ 2).  For over forty years, Defendant has provided logistical and fulfillment services to its customers throughout the world.

### B.     The Parties' Agreement

On July 1, 2006, the parties entered into their Agreement which expressly enumerated and governed the parties' rights and obligations between one another.[3]  The Agreement included an arbitration provision that required that the parties submit any claim arising out of or relating to the Agreement to mandatory, binding arbitration in Los Angeles, California.  Specifically, the Agreement's arbitration provision provides the following language:

> Any controversy or claim arising out of or related to this Agreement or breach thereof, except when injunctive relief or specific performance is sought, shall be settled by arbitration.  The office of the American Arbitration Association will arbitrate said controversy or claim, with jurisdiction in Los Angeles, California.

---

[3] The Agreement was later amended by an April 1, 2007 addendum which did not alter or affect any of the provisions placed at issue through the instant Motion. (*See* Bellew Dec. at ¶ 3).

> In the event that a dispute is submitted to arbitration, the arbitrator may award costs and reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be of the same force and effect as a final, enforceable judgment of a court of competent jurisdiction.

(Exhibit A at ¶ 14(g)).

In addition to the mandatory arbitration provision, the Agreement expressly details the services Defendant was required to provide, the financial responsibilities and commitments Plaintiff agreed to maintain, and the remedies available to each party given an alleged breach of the Agreement. Generally, Defendant was required to receive orders and update customer information from Plaintiff's multiple sales and retail sources. (Exhibit A at ¶ 3). When orders were received, Defendant was required to provide fulfillment services that included "the packaging of product, creation and application of mailing labels, packing slips and barcode labels." (*Id.* at ¶ 4). Further, Defendant was required to provide "'backend' customer service for calls pertaining to shipping information, refunds and standard customer service questions." (*Id.* at ¶ 3). Defendant maintained this information on an electronic database, which was made available to Plaintiff. (*Id.*).

In exchange for these services, Plaintiff agreed to compensate Defendant, including the advance payment of freight and postage charges. Specifically, Plaintiff agreed to pay Defendant for the services rendered pursuant to a specific payment schedule. (*Id.* at ¶¶ 2 and 8). Moreover, Plaintiff agreed that "all freight and postage charges [would be] paid in advance." (*Id.* at ¶ 4(d)). If Plaintiff failed to pay any invoice for services rendered or if the advance payment of freight and shipping costs was not current, the parties agreed that Defendant maintained the <u>sole discretion</u> to suspend all services, including Plaintiff's access to its purported data and database materials. Specifically, the Agreement provides the following language:

> <u>Non-Payment of Invoices</u>. [Defendant] retains sole discretion to suspend all services, including access to [Plaintiff's] data and database, in the event that [Plaintiff's] account is not current and

> will not resume work until [Plaintiff's] account is brought to
> current terms.  Additional monetary reserves may also be required,
> at the sole discretion of [Defendant], for resumption of services to
> commence.   [Defendant] is not liable for any and all charges
> incurred by [Plaintiff] for such stoppage.

(*Id.* at ¶ 4(h)(1)).  In addition, to the extent Plaintiff was not current on all amounts owed,

Plaintiff agreed to grant Defendant a general warehouseman's lien against all its property.  The

parties' warehouseman's lien provided for the following:

> [Plaintiff] hereby grants [Defendant] a General Lien against
> [Plaintiff] and all other persons or parties with respect to any and
> all [of Plaintiff's] property in [Defendant's] possession, and on the
> proceeds from the sale thereof, for all charges for storage,
> processing incidental to storage or transportation, including but not
> limited to demurrage and terminal charges, insurance, labor or
> charges present or future in relation to said property, and for
> expenses necessary for preservation of said property or reasonably
> incurred in their sale pursuant to law.

(*Id.* at ¶ 5(c)).  In the event that there was a dispute as to an invoice for any services rendered,

Plaintiff was required to pay any undisputed portion of the invoice and separately submit any

dispute that was not resolved after thirty (30) days to a mutually acceptable third party to

promptly arbitrate the dispute.  Specifically, the parties agreed that any dispute as to invoices for

services rendered would adhere to the following dispute resolution mechanism (in addition to the

general, mandatory arbitration provision contained at ¶ 14(g)):

> In the event that [Defendant] has delivered a disputed invoice to
> [Plaintiff], [Plaintiff] shall remit to [Defendant] the undisputed
> portion of such invoice, and [Plaintiff] and [Defendant] shall
> promptly work together to resolve the dispute.  In those instances
> where any dispute is not resolved within a period of thirty (30)
> days, [Plaintiff] and [Defendant] will select a mutually acceptable
> third party to promptly arbitrate said dispute.  Such a decision
> made by third party [*sic*] will be binding.

(*Id.* at ¶ 8).

The parties' Agreement does not contain a specific choice of law provision. However, the scope of services contemplated and provided under the Agreement involved and affected interstate commerce. (*See generally,* Exhibit A).

### C.     The Agreement Terminates

From the inception of the Agreement, Plaintiff failed to make timely or adequate payments as required under the Agreement. At times, the outstanding amounts owed exceeded $400,000.00. (Exhibit D at ¶ 3). During the times Plaintiff was deficient in remitting payments on outstanding invoices, Defendant informed Plaintiff that the parties' Agreement permitted it to suspend all services related to Plaintiff's account. (*Id.*) At the same time, Defendant worked in good faith with the Plaintiff to address and resolve its outstanding balances and the alleged disputes arising under the Agreement. Instead of honoring its obligations under the Agreement, on or about July 6, 2007, Plaintiff attempted to terminate the agreement for cause. (*Id.*). Plaintiff set the effective date for its alleged termination of the Agreement for July 31, 2007. (*Id.*).

As of July 12, 2007, Plaintiff owed Defendant more than $105,000.00 in past-due invoices. As a result, Defendant informed Plaintiff that it would enforce its rights under Section 4(h)(1) of the Agreement and suspend all services under the Agreement, including access to Plaintiff's data and the database. (*Id.* at ¶ 4). The parties continued to work in good faith to address their disputes, with Plaintiff ultimately paying a majority of the invoices then outstanding. (*Id.*).

## ARGUMENT

I.    **THE FAA REQUIRES A STAY OF THIS ACTION BECAUSE PLAINTIFF'S CLAIMS ALL ARISE FROM OR RELATE TO AN AGREEMENT CONTAINING A MANDATORY ARBITRATION PROVISION**

This action should be stayed in favor of an arbitration in Los Angeles, California because Plaintiff's claims are based on an Agreement that contains an agreed-upon provision for mandatory arbitration of disputes that arise from or relate to the Agreement. As expressly described in Plaintiff's Complaint, and as routinely held by this Court, litigation involving claims that arise from an agreement containing a valid and enforceable arbitration provision will be stayed (or even dismissed[4]) in favor of the parties' contractually-mandated arbitration efforts.

The FAA requires that the Court stay litigation involving claims that the parties contractually agreed would be submitted to arbitration. Specifically, 9 U.S.C. § 3 provides that if:

> any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

"Federal law determines whether an issue governed by the FAA is referable to arbitration." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir. 1999). "Questions concerning the interpretation and construction of arbitration agreements are determined by reference to federal substantive law." *Id.* at 179. When presented with a motion to stay pending arbitration, a court must determine: (i) whether there is a valid agreement to arbitrate and, if so, (ii) whether the specific dispute falls within the substantive scope of that agreement. *Mitsubishi Motors Corp. v.*

---

[4] Although Defendant filed a Petition to Compel Arbitration in the Superior Court of California, this Court can properly dismiss this action where, as here, all claims are arbitrable. *Sagal v. First USA Bank, N.A.*, 69 F. Supp. 2d 627, 632 (D. Del. 1999).

*Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28 (1985); *John Hancock Mutual Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998); *BAE Systems Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 585 (D. Del. 2004). As described herein, the facts and claims Plaintiff placed at issue through its Complaint squarely fit within the two criteria that necessitate a determination that a stay of these proceedings is both required and appropriate.

A.    **The Parties' Agreement Contains a Valid and Enforceable Arbitration Provision**

The arbitration provision placed at issue with this motion is part of a larger Agreement that is valid and enforceable. When evaluating the first element on a motion to stay, the court will first look toward the relevant state law of contracts in deciding whether an arbitration agreement is valid under the FAA. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). When interpreting contracts, courts are required to read contract language in a way that allows all the language to be read together, reconciling conflicts in the language without rendering nugatory any of portion of the contract. *CTF Hotel Holdings, Inc. v. Marriott Intern., Inc.*, 381 F.3d 131, 137 (3d Cir. 2004) (citing *New Castle Cty. v. National Union Fire Ins. Co.*, 174 F.3d 338, 349 (3d Cir. 1999)).

The parties' Agreement contains a valid and enforceable arbitration provision. Plaintiff did not allege in its Complaint and would be unable to prove on the merits that the Agreement's arbitration provision is invalid or unenforceable. Indeed, through its Complaint, Plaintiff avers that it is seeking to enforce various rights allegedly owed it under the Agreement. Accordingly, the first element necessary for the imposition of a stay is satisfied.

B.    **Plaintiff's Claims All Fall Within the Scope of the Parties' Agreement**

Plaintiff's entire Complaint is susceptible to mandatory arbitration because the claims fall within the scope of the parties' Agreement and the Agreement expressly provides for and governs the acts and alleged responsibilities. When attempting to "determine whether a claim

falls within the scope of an arbitration agreement, the 'focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint.'" *Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (quoting *Svedala Indus., Inc. v. Rock Engineered Machinery Co.*, 1996 WL 590861, at *3 (E.D. Pa. Oct. 11, 1996)). If the Court determines that there is an agreement to arbitrate and that the issues in dispute fall within the scope of the agreement, the Court must submit the matter to arbitration without ruling on the merits of the case. *Id.* (citing *Beck v. Reliance Steel Prods. Co.*, 860 F.2d 576, 579 (3d Cir.1988)). In fact, a court "may not deny arbitration, unless it can state with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *BAE Systems*, 224 F.R.D. at 585 (citing *First Liberty Inv. Group v. Nicholsberg*, 145 F.3d 647, 653 (3d Cir. 1998)). If, however, the scope of the arbitration agreement is disputed, the Court "may engage in a limited review to ensure that the dispute is arbitrable and, if appropriate, enter an order to compel or enjoin arbitration." *Appforge, Inc. v. Extended Systems, Inc.*, 2005 WL 705341, at *5 (D. Del. Mar. 28, 2005) (internal quotations and citations omitted). All doubts as to arbitrability should be resolved in favor of arbitration. *Kerr-McGee Chem., LLC v. Kemira Pigments Oy*, 2003 WL 22299045, at *4 (D. Del. Oct. 7, 2003) (citing *Sharon Steel Corp. v. Jewell Coal & Coke Co.*, 735 F.2d 775, 778 (3d Cir. 1984)).

Plaintiff's Complaint contains countless references to the parties' Agreement as the foundation for the duties Defendant allegedly breached. *See*, *e.g.*, Cmpt. ¶ 11 (alleging that the "Agreement [] specified that Defendant would support online access to [an] inventory database . . . of customer information (hereinafter "Database") includ[ing] a compilation, in electronic format, of all of Plaintiff's customer and sales information"); Cmpt. ¶ 100 (suggesting that while "the Agreement states that Defendant could suspend services for non-payment or non-current accounts, Defendant was not entitled to suspend services at any moment without proper

notification to Plaintiff"). Accordingly, it is evident that Plaintiff's Complaint, on its face, arises from and relates to the parties' Agreement.

To the extent Plaintiff argues that it is entitled to litigate claims for injunctive relief or specific performance, this argument, as framed by the allegations in Plaintiff's Complaint, is a non-starter because the Agreement can be plausibly read and interpreted to permit the actions and alleged inactions placed at issue.  Indeed, where a defendant can point to a specific contractual provision as the basis for its action or alleged inaction, the dispute becomes one that arises from and relates to the underlying agreement, regardless of any carve-out language contained in the arbitration provision.  In *BAE Systems Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, this Court reasoned around a clear contractual provision that carved-out a claim for injunctive relief relating to alleged confidential information from the parties' mandatory arbitration requirements and held that such claims were susceptible to arbitration.  224 F.R.D. at 586.

In *BAE Systems*, the plaintiff was required to develop and supply the defendant with specific electronic components for a production aircraft.  *Id.* at 583-84.  When the electronic components were not delivered at the quoted price, the defendant terminated the agreement for cause.  *Id.* at 584.  Following the termination, the plaintiff claimed that the defendant was using its designs and specifications (its purported confidential information) to complete the production aircraft.  *Id.* at 585.  Through its complaint, the plaintiff sought a preliminary and permanent injunction to protect its confidential information.  *Id.*

Under the parties' agreement, all claims were required to be submitted to and settled by binding arbitration, with the exception of claims related to purported confidential information – which entitled the non-disclosing party to seek injunctive relief from a court of competent jurisdiction.  *Id.* at 584.  As a result, the defendant presented a motion to dismiss or stay the

proceedings pending arbitration. *Id.* Based on this competing dispute resolution provisions, the Court identified "[a]t first glance" that the plaintiff's claims arguably fit within the agreement's broad definition of confidential information, which permitted the plaintiff to seek injunctive relief. *Id.* at 586. However, the Court did not conclude its analysis at that point, instead, reasoning that it was required to interpret a single provision of a contract in light of the contract as a whole. *Id.* Based on this precept, the Court recognized that when "[t]aken as a whole, the contract clearly indicates that, upon termination of the Agreement, [the defendant] is permitted to utilize [the plaintiff's] work product to complete work specified in the Agreement." *Id.* Based on the contractual prerogative extended to the defendant, the Court concluded that arbitration was the proper forum for resolution of the parties' disputes. *Id.* at 587.

The rationale embodied in the *BAE Systems* decision is equally applicable to the present action. Here, Plaintiff's request for injunctive relief stems directly from a disputed contractual provision related to Defendant's level and extent of services. Moreover, just like the defendant's in *BAE Systems*, here, Defendant has a contractual right to suspend the provision of all services at its sole discretion. (Exhibit A at ¶ 4(h)(1)). As in *BEA Systems*, where there are competing contractual rights underpinning a dispute that can be interpreted as non-arbitrable, the dispute becomes arbitrable because the rights and obligations can plausibly be read to arise from the underlying contractually agreement. *See, e.g., BAE Systems*, 224 F.R.D. at 586-87; *Appforge*, 2005 WL 705341, at *6 (recognizing that where the merits of both the claims and defenses turn on the scope and construction of the parties' rights under a written agreement, compelling arbitration of the claims is warranted); *Sharon Steel*, 735 F.2d at 778 (recognizing that an order to arbitrate "should not be denied unless it can be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute"); *Kerr-McGee*, 2003 WL 22299045, at *4 (reasoning that "'to acknowledge the ambiguity is to resolve the issue,

because all ambiguities must be resolved in favor of arbitrability'") (quoting *Armijo v. Prudential Ins. Co.*, 72 F.3d 793, 798 (10th Cir. 1995). Based on this plausible interpretation of the parties' rights and obligations under the Agreement, resolution of all Plaintiff's claims must be stayed in favor of the arbitration proceeding.

### C.    Federal Law and Policy Favor Arbitration of the Parties' Disputes

Federal policy favors arbitration, therefore, this Court should resolve any doubts about the scope of an arbitration agreement in favor of arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); *First Liberty Inv. Group*, 145 F.3d at 653. Section 2 of the FAA provides in relevant part that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. On this foundation, "[n]othing short of a showing of fraud, duress, mistake or some other compelling ground to invalidate a contract will permit a court to preclude the enforceability of an agreement to arbitrate." *Thornburg v. PAK 2000*, 2004 WL 234650, at *1 (D. Del. Feb. 2, 2004). "In determining whether a matter should be arbitrated, 'there is a strong presumption in favor of arbitration, and doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Gay v. CreditInform*, -- F.3d --, 2007 WL 4410362, at *14 (3d Cir. Dec. 19, 2007) (quoting G*reat W. Mortgage, Corp. v. Peacock*, 110 F.3d 222, 228 (3d Cir. 1997)).

Here, the parties agreed that all claims "arising out of or related to th[e] Agreement or breach thereof" would be submitted to mandatory arbitration in Los Angeles, California. Given the strong policy favoring arbitration, any portion of Plaintiff's Complaint that is not subject to

contractually-mandated arbitration should be stayed in favor of an arbitration that will resolve many of the disputed facts forming the basis of Plaintiff's Complaint.

## II.     EVEN IF PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS NOT ARBITRABLE, THE COURT SHOULD EXERCISE ITS DISCRETION TO STAY THE REQUEST UNTIL AFTER THE ARBITRATION PANEL ADJUDICATES THE UNDERLYING CLAIMS

Assuming, *arguendo*, that Plaintiff's request for injunctive relief is not susceptible to the parties' contractually-mandated arbitration obligations, the Court should nevertheless stay consideration of that request until such time as the arbitration panel adjudicates the merits of the underlying claims and defenses.  When confronted with a plaintiff advancing both arbitrable and non-arbitrable claims, courts have the discretion to stay proceedings of the non-arbitrable claims. *UMC Petroleum Corp. v. J & J Enterprises, Inc.*, 758 F. Supp. 1069, 1074 (W.D. Pa. 1991) (citing *Moses H. Cone*, 460 U.S. at 20 n.23).  Generally, when the arbitrable claims predominate or where the arbitrable claims will have some effect on non-arbitrable claims, a court will stay litigation of the non-arbitrable claims pending the outcome of arbitration.  *Elli v. Genmab, Inc.*, 2006 WL 2927622, at *7 (D.N.J. Oct. 12, 2006) (citing *Central Jersey Freightliner Inc. v. Freightliner Corp.*, 987 F. Supp. 289, 300-301 (D.N.J. 1997); *Allied Fire & Safety Equip. Co., v. Dick Enter.*, 886 F. Supp. 491, 498 (E.D. Pa. 1995)).

Plaintiff's request for injunctive relief is merely a remedy available to Plaintiff if it successfully carries the burden of proof of the claims that it agreed would be finally resolved through arbitration.[5]  If, as here, a plaintiff's non-arbitrable claims are dependant upon the resolution of an issue which must be arbitrated, that non-arbitrable claim must be stayed to preserve the right to arbitrate.  If the request for injunctive relief were allowed to proceed through this action, the parties would be forced to litigate the same underlying allegations and

---

[5] It is noteworthy that Plaintiff has not specifically pleaded the necessary elements or set forth a specific cause of action for injunctive relief.  Instead, Plaintiff merely asks for such relief in a conclusory fashion through its prayer for relief.

defenses before two tribunals – effectively eviscerating the benefits and efficiencies of an adjudication through arbitration. Considerations of judicial economy and adjudicatory efficiency suggest that any non-arbitrable portion of this action should be stayed in favor of the arbitration.[6] For these reasons, the Court should exercise its discretion to stay any non-arbitrable requests for relief until should time as the arbitration proceedings concludes.

## CONCLUSION

For the reasons stated herein, Defendant Moulton Logistics Management, Inc. respectfully requests that the Court stay this action in favor of the contractually-mandated arbitration proceeding that will take place in Los Angeles, California.

Dated: January 7, 2008

Joseph J. Bellew (#4816)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
*Attorneys for Defendant*

---

[6] The American Arbitration Association's ("AAA") Commercial Arbitration Rules permit Plaintiff to request interim and permanent equitable relief. *See* AAA Comm. Arb. R. 34 and 43.

## CERTIFICATE OF SERVICE

I, Joseph J. Bellew, do hereby certify that on January 7, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing to the following counsel of record:

> George Pazuniak, Esquire
> James M. Lennon, Esquire
> AnnaMartina L. Tyreus, Esquire
> Womble Carlyle Sandridge & Rice, PLLC
> 222 Delaware Avenue, Suite 1501
> Wilmington, DE  19801

> Joseph J. Bellew (#4816)
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington, DE  19801
> Telephone:  (302) 295-2000
> Facsimile:  (302) 295-2013
> Email:  jbellew@cozen.com

# Exhibit A

Moulton Logistics Management                                                                FSA_01262006



## FULFILLMENT SERVICES AGREEMENT

Following herewith is the Fulfillment Services Agreement ("AGREEMENT") between Moulton Logistics Management, hereinafter "MOULTON," and Greenhouse International, LLC, hereinafter "CLIENT" for the fulfillment and related services for Client's product: The Bean & Flex10

## RECITALS

MOULTON is engaged in the business of logistics and inventory management, specializing in providing consumer and retail order fulfillment, order and returns processing, specialty retail distribution services and warehousing.

CLIENT is engaged in the creation, production and wholesale distribution of the product included for purposes of this Agreement. Any other products, which from time to time, will be manufactured and/or sold or distributed under Client name, will be under separate Agreement.

CLIENT wishes to retain Moulton to perform certain services referred to herein, and Moulton wishes to provide such services on behalf of Client, in accordance with the terms and conditions set forth herewith.

The Effective Date of this Agreement is July 1, 2006 (Start Date) and the Termination Date is June 30, 2007, at which time an extension will be exercised if agreed upon by both parties.

## AGREEMENT

1. <u>Product Specifications and Special Services</u>. Please note Attachment A herewith.
2. <u>Pricing for Services</u>. Please note Attachment B herewith.
3. <u>Moulton Service Description</u>. Moulton will receive orders and updated customer information from Client's multiple sources. Data will be uploaded to Client's database on the Moulton mainframe for online Client service activity and reporting. Product will be picked and/or packed per order with processing and shipping of orders in accordance with fee schedule in the applicable Attachments herewith. Credit card orders will be selected based upon Client's current available inventory and freight deposit, and subsequently transmitted to merchant card processor for authorization and deposit. Moulton will process all available orders (credit card and prepaid), generate batch reports, packing slips, shipping labels and ship product. Moulton will provide "backend" customer service for calls pertaining to shipping information, refunds and standard customer service questions. Moulton supports online access to inventory database via internet connection from Client location.
4. <u>Fulfillment</u>. Moulton will provide services as outlined herein. Services will be based upon normal and customary services performed by Moulton unless otherwise designated by specific written instruction by Client. Rate adjustments may be required, and will be attached to Agreement as an Addendum, as necessary and appropriate. Rate adjustments and/or any changes to rate and discount schedules must be agreed to in writing by both parties to this Agreement, upon no less than sixty (60) days notice in writing. Moulton will coordinate with Client to receive product for distribution within the United States and applicable foreign countries. Fulfillment services will include, but are not limited to the packaging of product, creation and application of mailing labels, packing slips and barcode labels. Every effort will be made to ship orders within forty-eight (48) hours of receipt of Customer credit card authorization and Client freight deposit, and in accordance with designated pricing, capacity and scheduled terms established by Moulton. First run of any new product will provide for seventy-two (72) hours from receipt of Customer credit card authorization and Client freight deposit to allow for testing and additional quality control, and to enable the documentation of procedures to be utilized for subsequent

Accepted by Moulton
Page 1 of 10                                                             Accepted by Client

FSA_01262006

production runs. Shipment is based upon available inventory and freight deposit, and will be shipped via carrier as agreed upon by both parties to this Agreement, using Moulton shipping accounts and rates as specified herewith in the applicable Attachments. In the event that a third party or Client account is utilized, a one-time setup fee (as specified, if applicable) and ongoing freight coordination charges (per carton) will be assessed. Freight coordination charges are billed weekly, and terms are net ten (10) days.

a. <u>Orders</u>. Moulton will coordinate with Client operations for telemarketing, direct mail, internet and other third parties as necessary to receive orders for processing. Moulton will notify Client of orders received, shipped and inventory levels required for pending orders as necessary.

b. <u>Payment</u>. Orders will be processed for payment prior to shipping, unless previously designated, or where Client has payment processed prior to Moulton receiving orders. No credit card will be debited unless there is available inventory and appropriate freight deposit at Moulton for immediate shipment. Checks will be deposited directly to Client bank account or mailed per instruction for Client deposit. Check orders will be held for fourteen (14) days for bank clearance prior to product shipment, unless otherwise designated in writing by Client. It is Client responsibility to notify Moulton of NSF checks within the specified number of days, as stated above. Taxes will be collected for the State of California and/or other states designated by Client. Client is responsible for the disposition of said taxes and should consult professional advice in these matters. Moulton requires Client California Resale Number to be on file prior to order processing.

c. <u>Credits and Returns</u>. Credits will be issued directly to Client Customer credit card on a weekly basis upon receipt of product for the purchase price, less shipping and handling, unless other Client instruction is provided in writing. Visa and MasterCard require that refunds be issued no more than thirty (30) days after receipt of return. Moulton will provide check refund information to Client. Client is responsible for issuing check refunds to Customers, unless otherwise instructed by Client in writing. Returned product received directly from Customer will be received at Moulton warehouse and either stored or refurbished, as agreed upon by Moulton and Client. Refurbishment of product will be at Client expense. Returned product not refurbished and/or removed from inventory will be disposed of by recycle, destruction or return to a Client designated location after thirty (30) days at Client expense. Returned Retailer product is not accepted without prior notification of and approval by Moulton. Client is responsible for any retail product return sent "Freight Collect" to Moulton. Client must provide Retailer with a third party account number for a carrier to return product to Moulton warehouse, or Moulton will deduct any applicable freight charges from Client Freight Deposit.

d. <u>Freight Deposit</u>. Client hereby agrees that all freight and postage charges are paid in advance. Client is required to provide a minimum Freight Deposit of no less than the average two-week volume of freight charges. Weekly estimated volumes will be established and agreed upon by Moulton and Client, and may be adjusted from time to time requiring the subsequent deposit of additional funds as needed. Deposits or reserves may also be established for services and storage at the sole discretion of Moulton. Client freight deposit will be held in a non-interest bearing demands account, and drawn upon by Moulton to cover Client freight expenses. Current estimated freight charges must be paid in advance by Client to Moulton no less than twenty-four (24) hours prior to product shipment unless otherwise agreed to in writing by Moulton. Any outstanding freight balance not covered by freight deposit must be paid within ten (10) days of invoice.

e. <u>Fulfillment Turnaround and Performance</u>. Moulton will make all best efforts to achieve levels of fulfillment performance to include:

1. Fulfillment of all orders received by electronic files (or EDI) no later than 8:00am (local time at Moulton shipping location) before close on the second business day, excluding orders which have its particulars modified after original receipt.

2. Fulfillment of all orders received by electronic files after 8:00am (local time at Moulton shipping location) before close on the third business day, excluding orders which have its particulars modified after original receipt.

3. Notification to Client of all warehouse receipts within two (2) regular business days.

4. Provide complete processing of all product returns and appropriate notification to Client on a weekly basis.

Moulton will test and edit for proof of validity on client files and production received. Moulton will provide any necessary edits or corrections free of charge for a period of no more than thirty (30) days. After the initial test period of thirty (30) days, all Client data files received that require any and all editing or revisions for file validity will be either rejected back to Client, or accepted by Moulton and charged the current hourly programming rate to edit and repair. Client hereby agrees that in the event that Moulton is unable to meet fulfillment timelines due to the late receipt or quality of data files, Moulton will not liable for any costs incurred by Client. Moulton requires an initial EDI Trading Partner charge for set-up for both existing Moulton-approved trading partners and non-existing approved trading partners. Set-up charges for new partners (non-existing approved) will include all hourly programming, testing and implementation fees.

f.  Delay Due to Late Receipt of Product, Materials and Information. In connection with shipments and processing to Client's retail customers, Moulton is not liable for Client failure to meet scheduled mailing dates for any purchase in which product, material, mailing list or any other information, including Client change of instruction or receipt of freight deposit, necessary for completion of said purchase is not received by Moulton no less than four (4) working days prior to the scheduled mailing date, unless Client authorizes Moulton to incur at Client expense such overtime labor and other charges as necessary to complete order.

g.  Delay Due to Late Receipt of Data. Moulton is not liable for Client failure to transmit any and all data, either in a timely fashion or data that is not readily valid for order processing. Client will incur current hourly programming charges to edit for file validity.

h.  Work Stoppage. Client is liable for any and all charges incurred for work begun on Client behalf and stopped prior to completion at no fault of Moulton. Charges will be determined based upon but not limited to expended labor and materials, including labor and material costs for receiving product back into inventory.

    1.  Non-payment of Invoices. Moulton retains sole discretion to suspend all services, including access to Client data and database, in the event that Client account is not current, and will not resume work until Client account is brought to current terms. Additional monetary reserves may also be required, at the sole discretion of Moulton, for resumption of services to commence. Moulton is not liable for any and all charges incurred by Client for such stoppage.

i.  Recalls and Extraordinary Events: In the event that a government agency, consumer agency or Client determines that the product is defective or unsaleable for any reason, separate arrangements must be made for the return, storage and disposition of that product, at Client expense. Moulton will not store unsaleable product in its warehouses, and Client agrees to remove any such product from Moulton possession no more than thirty (30) days after such date that condition becomes known.

5.  Warehousing and Storage. Moulton will store all product and material in Moulton warehouse. Client shall pay storage charges as set forth in the applicable Attachments herewith. Moulton standard pallet charges are based upon pallets stacked four-high. In the event that Client inventory may be no more than double-stacked on pallet, rack or otherwise, Client hereby agrees that additional per pallet charges may apply. Moulton is liable for injury or damage to stored goods or property only if such injury or damage results from grossly negligent or willful acts of Moulton, or acts occurring during that time that Moulton has effective physical possession or control of Client product, and shall not in any event exceed the lesser of the reasonable cost of repairing damaged product, wholesale price of product at time of loss or damage occurred, Client internal cost to manufacture replacement products or the cost to replace damaged, lost or destroyed product with product of like kind and quality. The aforementioned cost will not include any allocated overheads, general design costs or other costs not specific to the actual replacement of Client product. Moulton is not liable for injury or damage to stored goods or property resulting from any other cause, including but not limited to actions by Client, Client employee or agent or any other third party; insects or vermin; depreciation or obsolescence, wear and tear; earthquake, flood weather or any act of God; fire, explosion, collapse of building or operation, failure or leakage of sprinkler system or roof; strike, war or civil unrest; breakage of glass or other fragile items, unless Moulton packed said items.

a.  Insurance. Client will carry and maintain commercial general liability insurance for product
    stored on Moulton premises or inbound containers to be unloaded at Moulton docks, and issue a
    Certificate of Insurance naming Moulton as additional insured.  If Client does not provide
    insurance coverage to Moulton, client will indemnify Moulton for any out-of-pocket expenses,
    including attorney's fees. Client hereby agrees that Commercial General Liability Insurance
    (CGL) be written on an Occurrence Form basis including (a) products and completed operations
    liability; (b) broad form property damage liability and (c) broad form contractual liability.
    Client will also maintain Commercial Property Insurance, written on an "All Risk" basis with a
    limit equal to or greater than the amount of product stored at Moulton premises or inbound
    containers to be unloaded at Moulton docks. Moulton's insurance is secondary.  Moulton will
    carry and maintain industry standard-form insurance coverage in the amount of $1,000 per
    pallet maximum ($100,000 lifetime maximum) to cover replacement costs.  Client must provide
    Moulton with replacement cost of product and material prior to Moulton receipt of inventory.
    Moulton liability arising out of or in any way related to Moulton performance of service
    provided to Client shall be limited to general money damages in an amount not to exceed the
    price actually paid by Client to Moulton with respect to said services.

b.  Shrinkage.  Moulton will make all best efforts to maintain a 98% inventory accuracy rate, with
    shrinkage less than 2% per year annualized per Client SKU.

c.  Warehouseman's Lien.  Client hereby grants Moulton a General Lien against Client and all
    other persons or parties with respect to any and all Client property in Moulton possession, and
    on the proceeds from sale thereof,  for all charges for storage, processing incidental to storage
    or transportation, including but not limited to demurrage and terminal charges, insurance, labor
    or charges present or future in relation to said property, and for expenses necessary for
    preservation of said property or reasonably incurred in their sale pursuant to law.

d.  Hazardous Goods.  Moulton does not store or ship hazardous goods.  If as a result of quality or
    condition of Client goods, of which Moulton had no notice at time of deposit, said goods are a
    hazard to other property or to persons, Moulton shall contact Client to remove said goods.
    Client hereby agrees to notify Moulton upon determination that goods are hazardous, and to
    remove same no later than five (5) days from date of determination.  In the event that Client
    does not remove said goods, Moulton may sell Client goods at public or private sale without
    advertisement on reasonable notification to all persons or parties known to claim an interest in
    same. Should Moulton remain unable to sell Client goods after reasonable effort, Moulton may
    dispose of same in any lawful manner and shall incur no liability by reason of such disposition.
    Pending such disposition, sale or return of Client goods, Moulton shall incur no liability by
    reason of such removal.

e.  Right to Inspect.  Client shall have the right from time to time to inspect Client product and
    material in Moulton possession.  Client agrees to provide no less than one (1) business days'
    notice to Moulton.  Client agrees that Client Right to Inspect does not constitute the audit of
    inventory or other inventory-related procedures.

f.  Inventory Audit.  Moulton has established general inventory audit procedures that will be in use
    for Client inventory in Moulton possession.  All SKUs will be counted no less than one (1) time
    during the course of any calendar year.  Moulton employs an ongoing cycle-count program to
    ensure inventory accuracy and to make all best efforts to avoid a "stock-out" or an order that
    can not be filled due to inaccurate inventory.  Moulton reserves the right to request specific
    inventory audit requirements in writing no less than one (1) month prior to the proposed audit
    date.  Said notice is required to provide notice for additional staffing requirements as needed
    and to ensure no conflict with any other previously scheduled audit. Moulton and Client hereby
    agree that no inventory audit will commence unless Client account is current and in good
    standing.

    1.  Clean Cutoff.  Moulton requires a "Clean Cutoff" to meet the requirements of Client
        audit, including a break in shipping and production, which allow for the reconciliation
        of any open Client orders and to conduct a count in the physical warehouse location
        from which inventory is generally shipped (also known as the ship location).  Said
        break in shipping must occur for no less than a forty-eight (48) hour period in which
        no new orders will be released to the production floor and all outstanding orders must

Accepted by Moulton _____
Page 4 of 10                                                        Accepted by Client _____

Moulton Logistics Management                                          FSA_01262006

be either shipped or canceled depending upon status. Upon completion of order reconciliation, a physical count of the ship location may commence.

2.  Physical Count. All rack, shelf, floor and bin locations can be counted and tagged, indicating the actual physical count. Counts will be determined by case quantity counts on all unopened cartons and unit counts on all opened cartons. Upon completion of all physical counts, an inventory system report will be generated indicating the levels reported on the Moulton inventory system. A check between the system report and the physical locations will be performed with any variance being recorded on the inventory tags. Discrepancies will be collected into a variance report, indicating the score of the overall audit.

3.  Special Requests. Moulton will review and approve any additional audit requirements requested by Client, and Client hereby agrees to any additional costs associated with such requests, including but not limited to labor and materials, and any programming or data processing fees associated with Client-required reports.

6.  Receipt and Inspection. Upon delivery of Client product or materials by carrier, Moulton shall unload same and visually inspect the outside of shipping containers for any noticeable damage and note same on shipping documents provided by the carrier. Moulton will visually inspect the condition of Client product or materials within the shipping containers, and to the extent possible, note any product or material that has escaped from containers, any noticeably damaged containers, or any containers missing product or materials. Moulton will make all best efforts to notify Client of any damaged product or materials prior to receiving into inventory. Moulton will promptly report to Client any shortages in quantities of product or materials received. Moulton will make every best effort to report to Client any damage to product or materials that Moulton may discover subsequent to Moulton acceptance from the carrier. Moulton shall not be obligated to inspect any Client product or materials for defect or damage which Moulton could not reasonably discover by external visual inspection of the shipping containers at the time of receipt of delivery. Further, Moulton is not liable for any concealed damage or concealed shortage of Client product or materials that are not detected through a visual review during the delivery process. Moulton shall not be liable for loss or damage to Client product or materials prior to their actual receipt by Moulton or after they are loaded on the carrier for delivery pursuant to Client instruction.

a.  Hours for Receiving. Moulton standard hours of operation for receiving inventory are Monday through Friday, 7am-5pm PST. Moulton requires an accurate forty-eight (48) hour written Advance Shipping Notice (hereinafter "ASN") for all inbound Client inventory to be received by Moulton. Client inventory received outside of the stated standard hours will be subject to Premium Receiving Rates, and must be accompanied by accurate Moulton ASN. Without accurate ASN, Moulton reserves the right to refuse any Client inventory, and any and all charges incurred by Client, including but not limited to handling, storage and transportation costs, are the sole responsibility and liability of Client. Supplemental services provided on behalf of Client during non-standard or Premium Receiving periods, including but not limited to clerical requests and wait time will be billed at Premium rates, as stated in the applicable Attachment herewith.

b.  Deep Storage Location. Moulton maintains a separate deep storage location. Client inventory may be stored from time to time at such location. Proper ASN notification is required to receive inventory, and written notice of no less than forty-eight (48) hours is required to transfer inventory to the main Moulton warehouse facility. Client inventory that is deemed "non-moving" for a period of ninety (90) days may be transferred to our deep storage facility. Deep storage pallet rates are charged at a reduced rate of regular pallet storage rates, however, transportation and handling fees may be assessed. Moulton will notify Client in advance of any transfer of inventory from main Moulton warehouse facility to deep storage location.

7.  Customer Service. Moulton will establish a toll free line (800 or 888) for inbound customer service. Moulton reserves the right to change the hours of operation based upon inbound call volume. The standard hours of operation are Monday through Friday, 8am-5pm PST. Telephone service is provided by third party carriers, and Moulton disclaims any responsibility for malfunctions that may arise from outside installation and maintenance of these lines by any third party company. Client will provide initial and any required ongoing training for Moulton customer service personnel, relating specifically to Client product and procedure. In the event that Client does not provide said training, Moulton will render services and Client will be charged accordingly. Moulton will strive for a minimum of a 90% service

Accepted by Moulton
Page 5 of 10                                                    Accepted by Client

FSA_01262006

level rate for inbound customer service telephone calls. Please see Attachment F: "Enhanced Call Center Services" for specific additional services and fees available.

    a.  Moulton will be closed for normal business on the following holidays (or the applicable Day of Observance):

> New Year's Day
> Memorial Day
> Independence Day
> Labor Day
> Thanksgiving Day
> Day After Thanksgiving Day
> Christmas Day

8. <u>Payment for Service</u>. All invoices are due upon receipt, but in no event may payment be made later than ten (10) days for services and ten (10) days for freight/postage expenses exceeding the balance in the reserve account. Moulton reserves the right to suspend all services if payment of invoice is not made within terms, and retains security interest in all Client product and material until accounts are current. Moulton, in its sole discretion, may impose a service charge of 1.5% per month of the outstanding balance remaining unpaid after the due date of any invoice. Should Moulton or Client ascertain that Moulton has erroneously billed Client for services, Moulton will create a Credit or Debit Note for the adjusted value and offset same against the original invoice(s), and such Credit or Debit Note will age concurrently with the original invoice(s). Moulton and Client hereby agree that any undercharge will have a maximum eighteen (18) month lookback period. In the event that Moulton has delivered a disputed invoice to Client, Client shall remit to Moulton the undisputed portion of such invoice, and Client and Moulton shall promptly work together to resolve the dispute. In those instances where any dispute is not resolved within a period of thirty (30) days, Client and Moulton will select a mutually acceptable third party to promptly arbitrate said dispute. Such decision made by third party will be binding.

9. <u>Warranties</u>. Moulton warrants that all services that it performs on behalf of Client, including but not limited to storage or warehousing services, will be performed in a competent and workmanlike manner, and that all products that it provides will be free of defects in material and workmanship for a period of thirty (30) days after mailing or shipping. Moulton obligation under the foregoing warranties is limited, at Moulton option, (i) for defective services to correct any error for which Moulton may be responsible, or monetary damages not to exceed the amount that the Client has actually paid Moulton for such services, or (ii) for defective products to repair, replace, or to refund the purchase price of the defective product up to the amount that the Client has actually paid Moulton for such product. Client shall make all warranty claims in writing to Moulton within a reasonable time after the discovery of the claimed defect, but in no event later than the expiration of the thirty (30) day warranty period. Client agrees that Moulton is not an insurer and does not protect Client against losses, damages, or liabilities of any kind or nature whatsoever arising out of the use by the Client of Moulton services.

    a.  <u>Limitations of Warranties</u>. Moulton is providing the products and services to the Client pursuant to limited express warranties extended by Moulton. These limited express warranties provide a specific description of Moulton's legal responsibilities. Moulton disclaims the implied warranties of merchantability and fitness for a particular purpose stated in the Uniform Commercial Code because those warranties are unlimited in duration and uncertain of application. Client hereby agrees and acknowledges that Moulton would not provide the services to the Client for the purchase price but for the disclaimer of such implied warranties contained in this Section, and that providing the products and services to the Client pursuant to the Agreement in exchange for the disclaimer of such implied warranties and the other consideration given by Moulton constitutes a bargain that is fair and reasonable to the parties.

    b.  <u>Indemnity by Moulton</u>. Moulton shall indemnify and defend Client and its officers, directors, agents and employees, and hold them harmless from and against all claims, suits, losses, liabilities, damages or expenses, including without limitation of costs of litigation (including appeal) and reasonable legal fees, arising from or in connection with any of the following: (i) any claim relating to personal injury, including death, or property loss or damage resulting from Moulton's negligent acts or omissions; and (ii) any action taken or failure to act by Moulton or on its behalf which constitutes willful misconduct or gross negligence on the part of Moulton or its employees or agents.

Accepted by Moulton
Page 6 of 10

Accepted by Client

    c.   Indemnity by Client.  Client shall indemnify and defend Moulton and its officers, directors, agents and employees, and hold them harmless from and against any and all claims, suits, losses, liabilities, damages or expenses, including without limitation storage, transportation and similar charges, costs of litigation including appeal, and legal fees arising from or in connection with any of the following: (i) any claim relating to personal injury, including death, or property loss or damage resulting from Client's negligent acts or omissions; (ii) any claim or other cause of action (a) involving a product liability claim arising from or relating to Products for which services are provided to Client hereunder, or (b) resulting from alleged defects in, or the inherently dangerous nature of Products that are the subject of this Agreement, or (c) relating to Client's right to sell and distribute Products that are the subject of this Agreement; (iii) any action taken or failure to act by Client or on its behalf which constitutes deliberate and willful misconduct or gross negligence on the part of Client or its employees or agents; and (iv) any claims, demands, or other assertions of rights adverse to the ownership and possession rights of Client made against Moulton.

10. <u>Changes to Rate and Discount Schedules</u>.  Moulton retains the right to amend or supplement any Attachment herewith upon sixty (60) days written notice to Client. Moulton agrees to negotiate in good faith any Attachment changes in advance of providing such written notice to Client. Pricing is subject to yearly cost of living percentage increase, minimum wage increase or US Department of Labor for CPI for Los Angeles Urban Consumers.  Increases in freight charges or accessorial (pass-through) charges by the carriers, including but not limited to Fuel Surcharges, will be amended to the applicable Attachment upon notification to Moulton by the carrier(s), without prior notice.  Moulton shall promptly notify Client of any such noticed change received by Moulton in this regard.

11. <u>Nondisclosure</u>.  Moulton and Client hereby acknowledge and agree that the following are confidential and proprietary information of the disclosing party:  (a) the type and amount of product received by Moulton, (b) the other party's pricing information regarding products and services, as applicable and (c) any other information regarding a party to this Agreement that is disclosed to the other but which is generally not known or available to the public. Each party agrees to hold in confidence and not to report, publish, disclose or transfer any such confidential and proprietary information to any person or entity without the other party's prior direction or consent, unless required to do so under applicable law or in furtherance of its obligations hereunder.

12. <u>Independent Contractor Status</u>.  Moulton and Client are and at all times shall remain independent contractors as to each other.  No joint venture, partnership, agency or other relationship which would impose liability upon one party for the act or failure to act of the other shall be created or implied by or from this Agreement. Each party acknowledges that to its knowledge, none of its respective officers, directors, employees or agents is covered under any employee benefit plans of the other party. Except as otherwise expressly set forth herein, each party shall bear full and sole responsibility for its own expenses, liabilities, trade creditors, employees, costs of operation and the like.  Neither party has or shall have the power to bind the other party or to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of the other party.

13. <u>Compliance with Moulton Standards and Client Standards of Operation</u>.  Moulton conducts its operations within the United States, so that it is and remains in full compliance with all laws of the United States in all aspects of its business. Moulton conducts itself and its operations to achieve the highest level of integrity and respect for human rights, including:

    a.   <u>Child Labor</u>.  Moulton will not employ any person under the age of sixteen or the legal age until after completion of compulsory education.

    b.   <u>Wages</u>.  Moulton pays its employees no less than the prevailing legal minimum wage, legally required benefits, mandated overtime rates and any other employment related benefits or requirements.

    c.   <u>Discrimination</u>.  Moulton does not discriminate in hiring, employment, promotion or other business practices on the grounds of religion, race, gender, national origin, sexual orientation, ethnic background or any other class or category as defined and protected by law.

    d.   <u>Health and Safety</u>.  Moulton follows all laws, including OSHA, State and Local, which detail how facilities and equipment must be set up to provide for a safe and secure working environment.

14. <u>Term of Agreement</u>.  Subject to the below subsections, this Agreement shall commence as of the Effective Date first set forth above in this Agreement, and shall terminate at midnight (Pacific Standard Time) immediately following the Termination Date also set forth above.

    a.   <u>Automatic Extension</u>.  Unless otherwise terminated prior to the Termination Date of this Agreement, or notice in writing is received by either party to this Agreement within ninety (90) days of the Termination Date, this Agreement shall remain in full force and effect for an additional term of one (1) year, until otherwise specified in writing.

    b.   <u>Period of Probation</u>.  Subject to test media or other production runs, this Agreement may be cancelled upon thirty (30) days written notice by either party to this Agreement. The Period of Probation commences upon the initial Effective Date of this Agreement only, and is not transferable or subject to extension or renewal.  In the event that either party elects to terminate this Agreement during said period, Client will be liable for all account set-up fees as well as any other service and freight charges, as well as account closing fees.  Additional service deposits may be required, subject to Moulton Logistics Management approval.  Client inventory, data and materials are subject to all applicable liens stated elsewhere in this Agreement.

    c.   <u>Termination Without Cause</u>.  Either party may terminate this Agreement upon ninety (90) days written notice.  All standard processing fees, monthly fees and minimums will still be applicable during the ninety (90) day closing period. All invoices must be current prior to the end of the ninety (90) days and should include any expected expenses relating to the closing of the account.  Upon receipt of written notice Moulton will prepare a memo outlining the procedure for closing the account.    A termination deposit is required to cover any unexpected expenses. Said deposit shall be no less than the standard freight deposit plus one month's estimated services.  Moulton retains the right to require additional deposit as needed.

    d.   <u>Termination for Cause or Material Breach</u>.  In the event that either party to this Agreement creates a material breach of any term or condition of this Agreement, said party will be notified in writing as to such breach, at the address and manner as detailed in this Agreement. The party causing said breach shall then have thirty (30) calendar days after the date of notification to cure to full satisfaction of the breached party.  In the event that the breach is not cured to the satisfaction of the breached party after thirty days, the breached party may terminate this Agreement immediately upon written notice to the party in breach. Moulton may also terminate this Agreement as the result of any repeated failure by Client to pay Moulton invoices within terms of this Agreement.

    e.   <u>Termination for Other Events</u>.  In the event that one party to this Agreement shall be adjudicated a bankrupt, institute voluntary proceeding for bankruptcy or reorganization, make an assignment for the benefit of its creditors, apply for or consent to the appointment of a receiver for it or its property, or admit in writing its inability to pay its debts as they become due, the other party shall have the right to terminate this Agreement immediately upon written notice to the party to which such event has occurred.

    f.   <u>Return of Product Following Termination</u>.  Moulton shall have the right to return to Client by common carrier at sole expense of Client any product remaining in Moulton possession following termination of this Agreement for any reason.  Client agrees to pay, in advance, all costs of storage, processing, labor, materials and any and all other charges incurred by Moulton.

    g.   <u>Arbitration</u>.  Any controversy or claim arising out of or related to this Agreement or breach thereof, except when injunctive relief or specific performance is sought, shall be settled by arbitration.  The office of the American Arbitration Association will arbitrate said controversy or claim, with jurisdiction in Los Angeles, California.  In the event that a dispute is submitted to arbitration, the arbitrator may award costs and reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be of the same force and effect as a final enforceable judgment of a court of competent jurisdiction.

    h.   <u>Consequential Damages</u>.    Notwithstanding anything to the contrary contained in this Agreement, in no event shall Moulton be liable to Client or any third party for incidental, consequential or punitive damages, including without limitation lost profits.

15. <u>Entire Agreement</u>.    Any Attachment pertaining to this Agreement and attached hereto will be incorporated herein by reference and expressly made a part of this Agreement. This Agreement, including its Attachments, constitutes the entire agreement between Moulton and Client hereto with

respect to the subject matter hereof. This Agreement supersedes all prior negotiations, letters, agreements and understandings relating to the subject matter hereof without limitation.

    a.   <u>Partial Invalidity</u>. In the event that any provision of this Agreement shall be held to be invalid or unenforceable by any court of competent jurisdiction, then the validity and enforceability of such provision as applied to any other particular facts or circumstances, and the validity of other provisions of this Agreement shall not in any way be affected or impaired thereby. In the event that a court of competent jurisdiction finds any of the provisions herewith to be so over broad in scope as to be unenforceable, such provisions may be reduced in scope by the court to the extent deemed necessary to render such provision reasonable and enforceable.

    b.   <u>Binding Effect</u>. This Agreement is entered into for the benefit of the parties and no provision thereof shall be interpreted or construed as creating any right of enforcement or cause of action on the part of any person who is not a party hereto. Notwithstanding the foregoing, but subject to the above, this Agreement shall inure to the benefit of, and shall be binding upon, the successors and permitted assigns of the parties.

16. <u>Force Majeure</u>. Moulton shall not be held in breach of this Agreement for any delay or failure in providing Client the services required under this Agreement for a period of thirty (30) days due to Acts of God, strike, riot, war, shortages or natural disasters over which Moulton has no control or can not reasonably anticipate or prevent. Should Force Majeure conditions continue for a period of more than thirty (30) days from the date upon which the event is first known or should have been known, Client shall have the right to terminate this Agreement, subject to the terms and conditions as stated above.

17. <u>Notices</u>. Any Notice to be given pursuant to this Agreement shall be in writing and shall be deemed to have been given at the earliest of (i) the time when delivered in person or via messenger to the persons identified below, (ii) actual receipt by the addressee, (iii) five (5) days after deposit in the US Mail, when sent postage prepaid and addressed to the intended recipient at the applicable address appearing below, or (iv) upon facsimile transmission to the number specified below, provided a contemporaneous facsimile confirmation is received. Each party may change its address and/or facsimile number for purposes of this paragraph by notice to the other party as provided herein.

If to Moulton, notices shall be sent to:

                Mr. Larry Moulton, President
                Moulton Logistics Management
                7850 Ruffner Avenue
                Van Nuys, CA 91406
                Telephone Number    (818) 997-1800
                Facsimile Number    (818) 997-8522

If to Client, notices shall be sent to:

                Mr. Bryan Sweeny
                Greenhouse International, LLC
                300 Creek View Road
                Suite 101
                Newark, DE 19711

                Telephone Number:    (302) 454-8334
                Facsimile Number:    (302) 454-8126

Accepted by Moulton
Page 9 of 10

Accepted by Client

Moulton Logistics Management

FSA_01262006

18. <u>Authorized Signatures</u>.  For the purpose of binding the parties to the above Fulfillment Services Agreement, the parties or their duly authorized representatives have signed their names below.

Moulton Logistics Management

By:_____    Dated: 8/16/06
        Larry Moulton, President

Greenhouse International, LLC

By:_____    Dated: 6/26/06
        Chris Lundin, CEO

# Exhibit B

NEVERS

PALAZZO

MADDUX
——— & ———
PACKARD

A Professional Law Corporation

31248 Oak Crest Drive, Suite 100, Westlake Village, California 91361
(818)879-9700 (805)495-0700   Fax (818)879-9680 Fax (805)495-4440

MICHAEL S. WILDERMUTH
mswildermuth@npmp.com

November 28, 2007

**_Via Facsimile (302) 661-7723 and U.S. Mail_**

James M. Lennon, Esq.
Womble, Carlyle, Sandridge & Rice
222 Delaware Avenue
Wilmington, DE 19801

      Re:   Greenhouse International, LLC v. Moulton Logistics Management, Inc., Civil
              Action No. 07-CV-00722

Dear Mr. Lennon:

      We represent Moulton Logistics Management in connection with the ongoing dispute
between Moulton Logistics Management, Inc. ("Moulton") and Greenhouse International, LLC
("Greenhouse") regarding the July 1, 2006 Fulfillment Services Agreement (the "Agreement").
Moulton was surprised to receive the lawsuit filed by Greenhouse considering that the parties
resolved the then-pending disputes concerning the Agreement in July 2007. Moulton informs us
that the allegations in the complaint are without merit and Moulton intends to pursue all avenues
for redress, including through the filing of a malicious prosecution action at the appropriate time.
Moulton also disputes that Delaware is the proper venue or that the Delaware court has personal
jurisdiction over Moulton.

      More importantly, the Agreement includes an arbitration provision in Paragraph 14.g.
that requires the parties to arbitrate all dispute arising under the Agreement in Los Angeles,
California through the American Arbitration Association offices in Los Angeles. Under this
provision and the applicable law, the only avenue for redress of any claims under the Agreement
is through a binding arbitration in Los Angeles, California.

      Accordingly, we insist that you immediately file a dismissal of the above action as is
required under California law and the Federal Arbitration Act. Otherwise, Moulton will file an
original proceeding in California state court to compel the arbitration and, additionally, it will
file a petition in the federal action seeking the same relief under the Federal Arbitration Act.
Moulton will seek the recovery of its attorney's fees in connection with these provisions in the
event that Greenhouse refuses to comply with the requirement to arbitrate the alleged dispute.



Exhibit   5

James M. Lennon, Esq.
November 28, 2007
Page 2

Please immediately confirm that you have dismissed the federal lawsuit and we can then discuss the timing of an arbitration and the selection of an arbitrator in California. If we do not receive confirmation of the dismissal by close of business on Monday December 3, 2007, we will proceed with the motion to dismiss and petitions to compel arbitration as discussed above.

Very truly yours,

Michael S. Wildermuth
of Nevers, Palazzo, Maddux & Packard, PLC

MSW/lm

cc:     Larry Moulton, Moulton Logistics Management
        Tony Sziklai, Moulton Logistics Mangement
        Donald J. Palazzo, Esq.
        Dexter Hamilton, Esq., Cozen O'Connor

W:\WORKING\13414\01\W0065463.DOC

# Exhibit C

1  | MICHAEL S. WILDERMUTH, ESQ., SB#143758
   | MARK S. REUSCH, ESQ., SB#210679
2  | NEVERS, PALAZZO, MADDUX & PACKARD, PLC
   | 31248 Oak Crest Drive, Suite 100
3  | Westlake Village, California 91361
   | Telephone: (818) 879-9700
4  | Facsimile: (818) 879-9680

5  | Attorneys for Petitioner Moulton Logistics
   | Management, Inc.

6

7

8

9                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10             **FOR THE COUNTY OF LOS ANGELES, NORTHWEST DISTRICT**

11

MOULTON LOGISTICS MANAGEMENT, | CASE NO. **LC080008**
12 INC.,

13            Petitioner,                | **PETITION TO COMPEL BINDING ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ANTHONY SZIKLAI; DECLARATION OF MICHAEL S. WILDERMUTH**
14      vs.

15 GREENHOUSE INTERNATIONAL, LLC,

16            Respondent.

17                                        | Discovery Cutoff:    None Set
                                          | Motion Cutoff:       None Set
18                                        | Trial Date:          None Set

19

20      Petitioner Moulton Logistics Management, Inc. ("Petitioner") hereby petitions the Court to

21 compel a binding arbitration against Respondent Greenhouse International, LLC ("Respondent") with

respect to the claims of Respondent as set forth in their Complaint filed in the United States District
22
Court, District of Delaware ("Complaint") pursuant to the terms of a written contract, the Federal
23
Arbitration Act ("FAA"), 9 U.S.C. §4 and California Code of Civil Procedure §1281.2 et seq., based
24
on the following information:
25
        1.      On July 1, 2006, Petitioner and Respondent entered into a written Fulfillment Services
26
Agreement ("Agreement") wherein Petitioner agreed to provide fulfillment and other related services
27
to Respondent for the sale and distribution of Respondent's products, the Bean and Flex 10. A copy of
28

---

1

1  the Agreement is attached to the Declaration of Anthony Sziklai as Exhibit "1." The Agreement was

2  entered in Los Angeles County, California, Respondent manufactured the products in Los Angeles,

3  California, and Petitioner received all orders and shipped all of Respondent's products from its

4  warehouse in Van Nuys, California.

5        2.    Paragraph 14.g of the Agreement provides as follows:

6             "g. Arbitration.  Any controversy or claim arising out of or related to
7             this Agreement or breach thereof, except when injunctive relief or
           specific performance is sought, shall be settled by arbitration.  The
8             office of the American Arbitration Association will arbitrate said
           controversy or claim, with jurisdiction in Los Angeles, California. In
9             the event that a dispute is submitted to arbitration, the arbitrator may
           award costs and reasonable attorney's fees to the prevailing party. The
           award of the arbitrator shall be of the same force and effect as a final
10            enforceable judgment of a court of competent jurisdiction."

11       3.    On November 9, 2007, Respondent filed a civil complaint in the United States District

12 Court, District of Delaware.  Respondent served the Complaint by mail on November 19, 2007,

13 shortly before the Thanksgiving holiday.  In filing the Complaint, Respondent ignored the arbitration

14 provisions in the Agreement.  All of the claims in the Complaint "arise[] out of or relate[] to th[e]

15 Agreement or breach thereof", where Respondent claims that Petitioner misappropriated Respondent's

16 trade secrets, breached the Agreement and interfered with Respondent's business allegedly as a direct

17 result of Petitioner's fulfillment work under the Agreement. (A copy of the Complaint is attached to

18 the Declaration of Anthony Sziklai as Exhibit "2".)  Respondent seeks monetary damages for these

19 claims.

20       4.    On November 28, 2007, Petitioner demanded that Respondent proceed with an

21 arbitration of the controversy in the manner provided in Paragraph 14.g. of the Agreement.

22 Respondent has refused, and continues to refuse, to do so, and Respondents have refused to dismiss

23 the Complaint. On or before December 24, 2007, Petitioner will file a motion to stay the Complaint

24 pending in the District Court in Delaware under the terms of the Federal Arbitration Act.

25       5.    The Agreement requires Petitioner and Respondent to arbitrate the matter.  Petitioner

26 requests an order from this Court that its dispute with Respondent be ordered into binding arbitration

27 in Los Angeles, California with the American Arbitration Association ("AAA") as required by the

28 Agreement.

1        6.      The Petitioner has not waived its right to arbitrate this matter pursuant to the terms of

2   the Agreement.

3        7.      Wherefore, Petitioner prays that the Court set this Petition for hearing and that at such

4   hearing an order compelling Respondent to arbitrate all of the claims raised in Respondent's

5   Complaint against Petitioner in Los Angeles, California with the AAA and that Petitioner be granted

6   such other and further relief as the Court may deem proper.

7   Dated: December 17, 2007                    Nevers, Palazzo, Maddux & Packard, PLC

8

9                                          By: _____

10                                               Michael S. Wildermuth
                                                 Mark S. Reusch
11                                               Attorneys for Petitioner Moulton Logistics
                                                 Management, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

Petitioner Moulton Logistics Management, Inc. ("Petitioner") respectfully submits this Memorandum of Points and Authorities in support of its Petition to Compel Binding Arbitration.

## 1.    PRELIMINARY STATEMENT

It is undisputed that the Fulfillment Services Agreement ("Agreement") between Petitioner and Respondent Greenhouse International, LLC ("Respondent") requires the parties to arbitrate all disputes arising out of or in connection with the Agreement. Rather than arbitrate certain claims between the parties relating to the Agreement, Respondent instead improperly filed a civil lawsuit in Federal District Court in the state of Delaware ("Complaint") where Respondent is incorporated.

Paragraph 14.g of the Agreement provides as follows:

> "g. Arbitration. Any controversy or claim arising out of or related to this Agreement or breach thereof, except when injunctive relief or specific performance is sought, shall be settled by arbitration. The office of the American Arbitration Association will arbitrate said controversy or claim, with jurisdiction in Los Angeles, California. In the event that a dispute is submitted to arbitration, the arbitrator may award costs and reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be of the same force and effect as a final enforceable judgment of a court of competent jurisdiction."

All of the claims in the Complaint "arise[] out of or relate[] to th[e] Agreement or breach thereof". In the Complaint, Respondent alleges that Petitioner misappropriated Respondent's trade secrets, engaged in deceptive trade practices and breached provisions of the Agreement in connection with Petitioner's fulfillment work for Respondent under the Agreement. The primary remedy Respondent seeks in the Complaint is monetary damages.

Respondents may not "pick and choose" the terms of the Agreement they wish to honor while at the same time suing Petitioner in a foreign court for alleged breaches of the Agreement. Respondent agreed in writing to pursue its claims against Petitioner in arbitration. Respondent is not permitted to simply refuse the arbitration process. Further, all of the applicable law requires that Respondent's agreement to arbitrate be enforced. Additionally, public policy strongly favors the enforcement of Respondent's agreement to arbitrate. Finally, the arbitration process is the most economical and expedient means of resolving this contractual dispute.

Accordingly, the Court should compel the Respondent to arbitrate their claims against

1

1  Petitioner with the AAA in Los Angeles, California, consistent with the terms of the Agreement.

2  2.    **FACTUAL BACKGROUND**

3       On July 1, 2006, Petitioner and Respondent entered into the Agreement wherein Petitioner

4  agreed to provide fulfillment and other related services to Respondent for the sale and distribution of

5  Respondent's products, the Bean and Flex 10. (Sziklai Declaration, Exhibit "1", ¶2.) The Agreement

6  was entered in Los Angeles County, California, Respondent manufactured the products in Los

7  Angeles, California, and Petitioner received all orders and shipped all of Respondent's products from

8  its warehouse in Van Nuys, California. (Ibid.)

9       Paragraph 3 of the Agreement provides that Petitioner will receive and process orders and

10  update customer information from Respondent's multiple sources, and provide "backend" customer

11  service for calls pertaining to shipping information, refunds and standard customer service questions.

12  (Anthony Sziklai Decl., Exhibit "1", ¶2.) Paragraph 4 of the Agreement provides that Petitioner will

13  provide fulfillment services which included packaging of the product, creation and application of

14  mailing labels, packing slips and barcode labels. (Ibid.)

15       The disputes between the parties clearly arise out of and are related directly to the Agreement

16  and the parties' performance (or lack thereof) of the terms of the Agreement. (Sziklai Dec., ¶3.) In

17  that regard, from the inception of the Agreement, Respondent did not timely make all of the payments

18  required by it to Petitioner in the time and manner required by the Agreement.  Unfortunately,

19  Respondent was consistently late in meeting its payment obligations, where at times the overdue

20  amount exceeded $400,000. (Ibid.) In order to ensure payment by Respondent, on several occasions

21  Petitioner informed Respondent that Paragraph 4(h)(1) of the Agreement permitted Petitioner to

22  suspend all services related to Respondent's account.  Paragraph 4(h)(1) provides that:

23       "Moulton retains sole discretion to suspend all services, including access to Client data
         and database, in the event that Client account is not current, and will not resume work
24       until Client account is brought to current terms.  Additional monetary reserves may
         also be required, at the sole discretion of Moulton, for resumption of services to
25       commence.  Moulton is not liable for any and all charges incurred by Client for such
         stoppage." (Ibid.)
26
         Through various good faith attempts to retain the relationship, Petitioner attempted to work
27
    with Respondent to keep the shipments flowing while at the same time, to encourage Respondent to
28

1   bring the account current. (Sziklai Dec., ¶3.) Respondent did not make the same effort to honor its

2   contractual obligations under the Agreement. (Ibid.) Instead, Respondent gave notice to terminate

3   the Agreement effective July 31, 2007, where it decided to use a new fulfillment company for its

4   products. (Ibid.)

5          As of July 12, 2007, Respondent owed Petitioner over $105,000 in past due invoices. (Id. at

6   ¶4.) As a result, Petitioner put Respondent on notice that Petitioner was enforcing the terms of the

7   Agreement, requiring that Respondent pay all past-due invoices in full and requiring that all future

8   services that may be required by Respondent, including freight and services, be pre-paid. (Ibid.)

9   Rather than pay what was owed, Respondent continued to make excuses as to why it could not pay the

10  full amount owed at that time. (Ibid.; Wildermuth Decl., Exhibits "3" and "4", ¶2.) Respondent

11  ultimately paid $100,000 towards the amounts owing and Petitioner cooperated in the transition of the

12  business to the new fulfillment company, including through the delivery of the inventory and the

13  customer database, and it processed certain remaining orders. (Ibid.) Petitioner believed the matter

14  was resolved as of that time. (Ibid.)

15         Without any further notice, on November 9, 2007, Respondent filed its Complaint, alleging

16  that Petitioner misappropriated Respondent's trade secrets, tortiously interfered with Respondent's

17  business, violated §1125(a)(1)(A) of the Lanham Act, engaged in deceptive and unfair trade practices

18  and breached several provisions of the Agreement. (Sziklai Decl. Exhibit "2", ¶5.)

19         On November 28, 2007, Petitioner made a demand to Respondent to submit its claims to

20  arbitration and to dismiss its Complaint. (Sziklai Decl., ¶6; Wildermuth Decl. Exhibit "5", ¶3.)

21  However, Respondent refused and continues to refuse to submit its claims to arbitration pursuant to

22  the Agreement. (Ibid.) Since the arbitration provision from the Agreement calls for arbitration to be

23  conducted by the American Arbitration Association with jurisdiction in Los Angeles, California, the

24  arbitration should be conducted in Los Angeles, California and not in a civil lawsuit Delaware.

25         Wherefore, Petitioner prays that the Court set this Petition for hearing and that at such hearing

26  that an order be issued compelling Respondent to arbitrate all of the claims in Respondent's Federal

27  District Court complaint against Petitioner in Los Angeles, CA with AAA and that Petitioner be

28  granted such other and further relief as the Court may deem proper.

1

2    3.    <u>ARGUMENT</u>

3        A.     <u>The Arbitration Process is Required by Contract and Law</u>

4           1.     <u>The Federal Arbitration Act Applies to the Parties' Arbitration Agreement</u>

5        The Federal Arbitration Act (hereinafter "FAA") applies to a contract "evidencing a

6 transaction involving commerce" and compels state courts to enforce private arbitration agreements.

7 See 9 U.S.C. §2. State courts "may not … invalidate arbitration agreements under state laws

8 applicable only to arbitration provisions." <u>Doctor's Associates, Inc. v. Casarotto</u> (1996) 517 U.S. 681,

9 686-687.

10        There is no question that the FAA applies to the Agreement at issue in this case. The

11 Agreement involves the assistance by Petitioner with the sale of Respondent's goods through interstate

12 commerce. In <u>Basura v. U.S. Home Corporation</u> (2002) 98 Cal. App. 4th 1205, 1213, the developer

13 had sales agreements with the plaintiff that included an arbitration clause. The court in <u>Basura</u> held

14 that because the homes which U.S. Home Corporation built and sold to plaintiff involved interstate

15 commerce, the agreements were covered by the FAA. <u>Id.</u> at 1214. In the case, U.S. Home presented

16 evidence that the receipt and use of building materials and equipment were manufactured and/or

17 produced in states outside California, that it communicated by interstate mail and telephone and

18 engaged in marketing and advertising throughout the country using interstate media.

19        Petitioner's and Respondent's business activities generally effect interstate commerce.

20 Respondent markets its products throughout the country. Petitioner received orders for those products

21 on behalf of Respondent from around the country and shipped Respondent's products to customers in

22 various states. For these reasons, the subject Agreement is clearly governed by the FAA.

23           2.     <u>The Arbitration Agreement is Enforceable Under the Federal Arbitration Act</u>

24        Respondent is improperly attempting to sue Petitioner in United States District Court, District

25 of Delaware, claiming breach of the Agreement, and various other related causes of action, while

26 simultaneously refusing to honor the terms of the Agreement. Here, the arbitration provision in the

27 Agreement on which Respondent sues requires that such claims be arbitrated.

28        Under the Federal Arbitration Act, a court is required to compel the parties to a written

1  arbitration agreement to arbitrate disputes covered by that agreement – the court does not have

2  discretion to do otherwise. <u>Dean Witter Reynolds Inc. v. Byrd</u> (1985) 470 U.S. 213, 218 (FAA

3  "leaves no place for the exercise of discretion"); <u>Chiron Corp. v. Ortho Diagnostic Systems, Inc.</u> (9th

4  Cir. 2000) 207 F.3d 1126, 1130. To grant a party's motion to compel arbitration, a court must find:

5  (1) an enforceable agreement to arbitrate exists, and (2) the claims sought to be arbitrated are

6  encompassed within the scope of the arbitration clause. <u>Chiron</u>, <u>supra</u>, 207 F.3d at 1130; <u>Simula, Inc.</u>

7  <u>v. Autoliv, Inc.</u> (9th Cir. 1999) 175 F.3d 716, 719-720. Once these elements are established, such

8  agreements are rigorously enforced. <u>Simula</u>, <u>supra</u>, 175 F.3d at 719. The existence and scope of an

9  arbitration agreement must be determined before other issues; if there is an issue of fact, "the court

10  shall proceed summarily to the trial thereof." 9 U.S.C. §4. These elements are determined according

11  to the applicable contract law standards of the jurisdiction. <u>Chelsea Squares Textiles, Inc. v. Bombay</u>

12  <u>Dyeing and Mfg. Co., Ltd.</u> (2d Cir. 1999) 189 F.3d 289, 295-296.

13        The Agreement contains a written arbitration provision, which requires both parties to arbitrate

14  "any controversy or claim arising out of or related to this Agreement or breach thereof." The

15  Agreement is the basis for all of Respondents causes of action in its lawsuit filed in the Federal

16  District Court. As set forth in the Agreement:

17      "Any controversy or claim arising out of or related to this Agreement or breach
    thereof, except when injunctive relief or specific performance is sought, shall be

18      settled by arbitration. The office or the American Arbitration Association will
    arbitrate said controversy or claim, with jurisdiction in Los Angeles, California. In the

19      event that a dispute is submitted to arbitration, the arbitrator may award costs and
    reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be

20      of the same force and effect as a final enforceable judgment of a court of competent
    jurisdiction." (Anthony Sziklai Decl., ¶2, Exhibit "1.")

21

22        Each of the parties initialed the bottom of the page which contained the arbitration provision in

23  the Agreement. In this case, the Agreement is unequivocal that arbitration of the Respondent's (as

24  well as Petitioner's cross-claims) arising from the alleged breaches of the Agreement is required by the

25  Agreement. The provision for arbitration in the Agreement is broad, calling for arbitration of all

26  claims arising out of or related to this Agreement or breach thereof, and it should be construed

27  liberally. <u>Simula</u>, <u>supra</u>, 175 F.3d at 716 (liberally interpreting scope of clause calling for arbitration

28  of "[a]ll disputes arising in connection with this Agreement"). The presumption in favor of arbitration

PETITION TO COMPEL BINDING ARBITRATION

1   is even stronger when the scope of the arbitration agreement is broad.  <u>Dennis L. Christensen Gen.</u>

2   <u>Bldg. Contractor, Inc. v. Southern Cal. Conference of Carpenters</u> (9th Cir. 1991) 952 F.2d 1073, 1077.

3           Because the Agreement between Petitioner and Respondent requires arbitration of any and all

4   claims, and because Federal law clearly makes such agreements enforceable, Petitioner requests that

5   the Court compel Respondent to arbitrate their claims in their currently pending Federal District Court

6   complaint.

7               3.      <u>The Arbitration Agreement Is Enforceable Under California Law</u>

8           Where parties have agreed to arbitrate their differences, it is the clear intent of arbitration

9   statutes in California that courts should enforce performance of that agreement. <u>Cione v. Foresters</u>

10  <u>Equity Services</u> (1997) 58 Cal. App. 4th 625, 68 Cal. Rptr. 2d 167.  The policy and practice was well

11  stated by the California Court of Appeal for the Second District, as follows:

12          "... [T]he legislature has expressed a strong public policy in favor of arbitration as a
        speedy and relatively inexpensive means of dispute resolution. As a result, courts will
13          indulge every intendment to give effect to such proceedings. (citation omitted)
        'Indeed, more than 70 years ago this court explained: 'The policy of the law in
14          recognizing arbitration agreements and in providing by statute for their enforcement is
        to encourage persons who wish to avoid delays incident to a civil action to obtain an
15          adjustment of their differences by a tribunal of their own choosing' (<u>Utah Const. Co. v.
        Western Pac. Ry. Co.</u> (1916) 174 Cal. 156, 159 [162 P. 631]. Typically, those who
16          enter into arbitration agreements expect that their dispute will be resolved without
        necessity for any contact with the courts'". <u>Valsan Partners v. Calcor Space Facility</u>
17          (1994, 2nd Dist.) 25 Cal.App. 4th 809, 816, 30 Cal. Rptr. 2d 785.

18  Code of Civil Procedure Section 1281.2 provides:

19          "On petition of a party to an arbitration agreement alleging the existence of a written
        agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such
20          controversy, the court shall order the petitioner and the respondent to arbitrate the
        controversy if it determines that an agreement to arbitrate the controversy exists,
21          unless it determines that:

22          (a)     The right to compel arbitration has been waived by the petitioner; or

23          (b)     Grounds exist for the revocation of the agreement.

24          (c)     A party to the arbitration agreement is also a party to a pending court action or
        special proceeding with a third party, arising out of the same transaction or series of
25          related transactions and there is a possibility of conflicting rulings on a common issue
        of law or fact. For purposes of this section, a pending court action or special
26          proceeding includes an action or proceeding initiated by the party refusing to arbitrate
        after the petition to compel arbitration has been filed, but on or before the date of the
27          hearing on the petition....

28          . . .

                                    6

1      If the court determines that a party to the arbitration is also a party to litigation in a
2    pending court action or special proceeding with a third party as set forth under
subdivision (c) herein, the court (1) may refuse to enforce the arbitration agreement
3    and may order intervention or joinder of all parties in a single action or special
proceeding; (2) may order intervention or joinder as to all of only certain issues: (3)
4    may order arbitration among the parties who have agreed to arbitration and stay the
pending court action or special proceeding pending the outcome of the arbitration
5    proceeding; or (4) may stay arbitration pending the outcome of the court action or
special proceeding."

6      Here, there is no question that the disputes between the parties involving the Agreement must

7  be arbitrated under the terms of the Agreement.

8    **B.**    **Public Policy Strongly Favors Enforcement of Arbitration Provisions**

9      In determining whether a dispute is arbitrable, courts must consider the FAA's strong public

10  policy favoring arbitration over litigation. See Moses H. Cone Memorial Hospital v. Mercury

11  Construction Corp. (1983) 460 U.S. 1, 24 ("[9 U.S.C. section 2] is a congressional declaration of a

12  liberal federal policy favoring arbitration agreements."). As mentioned above, "any doubts concerning

13  the scope of arbitrable issues should be resolved in favor of arbitration." Id. at 24-25; Simula, supra,

14  175 F.3d at 719; Wolsey, Ltd. v. Foodmaker, Inc. (9th Cir. 1998) 144 F.3d 1205, 1209 (arbitration

15  need not be binding to fall under FAA); Ever-Gotesco Resources and Holdings, Inc. v. Pricesmart,

16  Inc. (S.D. Cal. 2002) 192 F.Supp. 2d 1040, 1042; citing Simula and Moses Cone.

17      The presumption in favor of arbitrability is strong. When an agreement has an arbitration

18  clause, arbitration should not be denied "unless it may be said with positive assurance that the

19  arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT&T

20  Technologies, Inc. v. Communications Workers of America (1986) 475 U.S. 643, 650. "Doubts

21  should be resolved in favor of coverage." Id.

22      Petitioner's and Respondent's Agreement to arbitrate their claims must be enforced under the

23  FAA and California law. All of Respondent's Complaint are all based on various alleged breaches of

24  the Agreement by Petitioner. Respondent cannot truthfully allege its full compliance with the

25  Agreement while continuing to disregard the arbitration provision set forth in paragraph 14.g of the

26  Agreement.

27  ///

28  ///

1

4.    **CONCLUSION**

2        For the reasons stated above, the Court should issue an Order compelling Respondent to

3    arbitrate all of the claims raised in Respondent's Complaint against Petitioner in Los Angeles,

4    California with the AAA under the terms of the Agreement.

5    Dated: December 17, 2007            Nevers, Palazzo, Maddux & Packard, PLC

6

7                                        By: _____

8                                            Michael S. Wildermuth
                                             Mark S. Reusch
9                                            Attorneys  for  Petitioner  Moulton  Logistics
                                             Management, Inc.

10   W:\WORKING\13414\01\W0065519.DOC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attachments to Exhibit C are Intentionally Omitted

# Exhibit D

1

DECLARATION OF ANTHONY SZIKLAI

2

I, Anthony Sziklai, declare as follows:

3

    1.    I am an officer of Petitioner Moulton Logistics Management, Inc. ("Petitioner") in the

4

above-entitled action. I have personal knowledge of the facts set forth herein, which are known by me

5

to be true and correct, and if called as a witness, I could and would competently testify thereto.

6

    2.    On July 1, 2006, Petitioner and Respondent entered into a written Fulfillment Services

7

Agreement ("Agreement") wherein Petitioner agreed to provide fulfillment and other related services

8

to Respondent for the sale and distribution of Respondent's products, the Bean and Flex 10. A true

9

and correct copy of the Agreement is attached hereto as Exhibit "1." The Agreement was entered in

10

Los Angeles County, California. Respondent manufactured the products in Los Angeles, California,

11

and Petitioner received all orders and shipped all of Respondent's products from its warehouse in Van

12

Nuys, California. Paragraph 3 of the Agreement provides that Petitioner will receive and process

13

orders and update customer information from Respondent's multiple sources, and provide "backend"

14

customer service for calls pertaining to shipping information, refunds and standard customer service

15

questions. Paragraph 4 of the Agreement provides that Petitioner will provide fulfillment services

16

which included packaging of the product, creation and application of mailing labels, packing slips and

17

barcode labels. The arbitration provision, which is contained in Paragraph 14.g, provides as follows:

18
19
20
21
22

"Any controversy or claim arising out of or related to this Agreement or breach thereof, except when injunctive relief or specific performance is sought, shall be settled by arbitration. The office or the American Arbitration Association will arbitrate said controversy or claim, with jurisdiction in Los Angeles, California. In the event that a dispute is submitted to arbitration, the arbitrator may award costs and reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be of the same force and effect as a final enforceable judgment of a court of competent jurisdiction."

23

    3.    The disputes between the parties clearly arise out of and are related directly to the

24

Agreement and the parties' performance (or lack thereof) of the terms of the Agreement. In that

25

regard, from the inception of the Agreement, Respondent did not timely make all of the payments

26

required by it to Petitioner in the time and manner required by the Agreement. Unfortunately,

27

Respondent was consistently late in meeting its payment obligations, where at times the overdue

28

amount exceeded $400,000. In order to ensure payment by Respondent, on several occasions

1

PETITION TO COMPEL BINDING ARBITRATION

1   Petitioner informed Respondent that Paragraph 4(h)(1) of the Agreement permitted Petitioner to

2   suspend all services related to Respondent's account.  Paragraph 4(h)(1) provides that:

3          "Moulton retains sole discretion to suspend all services, including access to Client data
and database, in the event that Client account is not current, and will not resume work

4          until Client account is brought to current terms.  Additional monetary reserves may
also be required, at the sole discretion of Moulton, for resumption of services to

5          commence.  Moulton is not liable for any and all charges incurred by Client for such
stoppage."

6

7       Through various good faith attempts to retain the relationship, Petitioner attempted to work

8   with Respondent to keep the shipments flowing while at the same time, to encourage Respondent to

9   bring the account current.  Respondent did not make the same effort to honor its contract obligations

10   under the Agreement.  Instead, Respondent gave notice to terminate the Agreement effective July 31,

11   2007, where it decided to use a new fulfillment company for its products.

12        4.     As of July 12, 2007, Respondent owed Petitioner over $105,000 in past due invoices.

13   As a result, Petitioner put Respondent on notice that Petitioner was enforcing the terms of the

14   Agreement, requiring that Respondent pay all past-due invoices in full and requiring that all future

15   services that may be required by Respondent, including freight and services, be pre-paid.  Rather than

16   pay what was owed, Respondent continued to make excuses as to why it could not pay the full amount

17   owed at that time.  Respondent ultimately paid $100,000 towards the amounts owing and Petitioner

18   cooperated in the transition of the business to the new fulfillment company, including through the

19   delivery of the inventory and the customer database, and it processed certain remaining orders.

20   Petitioner believed the matter was resolved as of that time.

21        5.     Without any further notice, on November 9, 2007, Respondent filed its Complaint,

22   alleging that Petitioner misappropriated Respondent's trade secrets, tortiously interfered with

23   Respondent's business, violated §1125(a)(1)(A) of the Lanham Act, engaged in deceptive and unfair

24   trade practices and breached several provisions of the Agreement.  A true and correct copy of the

25   Complaint is attached hereto as Exhibit "2".

26   ///

27   ///

28   ///

2

PETITION TO COMPEL BINDING ARBITRATION

P. 002/002

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6.     On November 28, 2007, Petitioner made a demand to Respondent to submit its claims to arbitration and to dismiss its Complaint. However, Respondent refused and continues to refuse to submit its claims to arbitration pursuant to the Agreement.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed December 17, 2007, at Van Nuys, California.

Anthony Sziklai

PETITION TO COMPEL BINDING ARBITRATION