IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GREENHOUSE INTERNATIONAL, LLC,     :
                                   :
                Plaintiff,         :     C.A. No. 07-722-GMS
                                   :
        v.                         :
                                   :
MOULTON LOGISTICS MANAGEMENT,      :
INC.,                              :
                                   :
                Defendant.         :

## DECLARATION OF JOSEPH J. BELLEW, ESQUIRE

I, Joseph J. Bellew, hereby state in accordance with the provisions of Title 28, section 1746 of the United States Code as follows:

1.     I am over eighteen (18) years of age and competent to testify regarding the facts stated herein.

2.     I am a member of the law firm Cozen O'Connor and I have personally participated in the review of the Complaint in this action and the agreements, documents and correspondence underlying the parties' disputes.

3.     Attached hereto as Exhibit A is a copy of the Fulfillment Services Agreement ("Agreement") entered into between Plaintiff Greenhouse International, LLC ("Plaintiff") and Defendant Moulton Logistics Management, Inc. ("Defendant") dated July 1, 2006.

4.     There is an April 1, 2007 Addendum to the Agreement which did not alter or affect any of the provisions placed at issue with Defendant's Motion to Stay.

5.     Attached hereto as Exhibit B is the November 28, 2007 letter from counsel for Defendant to counsel for Plaintiff demanding that the claims presented in this action be submitted to contractually-mandated arbitration in Los Angeles, California.

6.     Attached hereto as Exhibit C is a copy of Defendant's Petition to Compel Arbitration and its accompanying Memorandum of Points and Authorities filed in the Superior

Court of California, in and for Los Angeles County. Defendant's Petition and accompanying Memorandum were filed on December 18, 2007. Upon information and belief, Defendant's Petition will be presented to the Superior Court of California by way of a hearing currently scheduled for February 20, 2008.

7.       Attached hereto as Exhibit D is the Declaration of Anthony Sziklai. Mr. Sziklai is an officer of Defendant, and his declaration was filed in the Superior Court of California together with Defendant's Memorandum in support of Defendant's Petition to Compel Arbitration.

8.       Pursuant to D. Del. LR 7.1.1, I certify that attempts were made to determine if Plaintiff would consent to a stay of this action and Plaintiff would not consent to a stay.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 7th day of January, 2008.

_____
Joseph J. Bellew (#4816)

**CERTIFICATE OF SERVICE**

I, Joseph J. Bellew, do hereby certify that on January 7, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing to the following counsel of record:

> George Pazuniak, Esquire
> James M. Lennon, Esquire
> AnnaMartina L. Tyreus, Esquire
> Womble Carlyle Sandridge & Rice, PLLC
> 222 Delaware Avenue, Suite 1501
> Wilmington, DE  19801


> Joseph J. Bellew (#4816)
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington, DE  19801
> Telephone:  (302) 295-2000
> Facsimile:  (302) 295-2013
> Email:  jbellew@cozen.com

# Exhibit A



## FULFILLMENT SERVICES AGREEMENT

Following herewith is the Fulfillment Services Agreement ("AGREEMENT") between Moulton Logistics Management, hereinafter "MOULTON," and Greenhouse International, LLC, hereinafter "CLIENT" for the fulfillment and related services for Client's product: The Bean & Flex10

## RECITALS

MOULTON is engaged in the business of logistics and inventory management, specializing in providing consumer and retail order fulfillment, order and returns processing, specialty retail distribution services and warehousing.

CLIENT is engaged in the creation, production and wholesale distribution of the product included for purposes of this Agreement. Any other products, which from time to time, will be manufactured and/or sold or distributed under Client name, will be under separate Agreement.

CLIENT wishes to retain Moulton to perform certain services referred to herein, and Moulton wishes to provide such services on behalf of Client, in accordance with the terms and conditions set forth herewith.

The Effective Date of this Agreement is July 1, 2006 (Start Date) and the Termination Date is June 30, 2007, at which time an extension will be exercised if agreed upon by both parties.

## AGREEMENT

1.  <u>Product Specifications and Special Services</u>. Please note Attachment A herewith.
2.  <u>Pricing for Services</u>. Please note Attachment B herewith.
3.  <u>Moulton Service Description</u>. Moulton will receive orders and updated customer information from Client's multiple sources. Data will be uploaded to Client's database on the Moulton mainframe for online Client service activity and reporting. Product will be picked and/or packed per order with processing and shipping of orders in accordance with fee schedule in the applicable Attachments herewith. Credit card orders will be selected based upon Client's current available inventory and freight deposit, and subsequently transmitted to merchant card processor for authorization and deposit. Moulton will process all available orders (credit card and prepaid), generate batch reports, packing slips, shipping labels and ship product. Moulton will provide "backend" customer service for calls pertaining to shipping information, refunds and standard customer service questions. Moulton supports online access to inventory database via internet connection from Client location.
4.  <u>Fulfillment</u>. Moulton will provide services as outlined herein. Services will be based upon normal and customary services performed by Moulton unless otherwise designated by specific written instruction by Client. Rate adjustments may be required, and will be attached to Agreement as an Addendum, as necessary and appropriate. Rate adjustments and/or any changes to rate and discount schedules must be agreed to in writing by both parties to this Agreement, upon no less than sixty (60) days notice in writing. Moulton will coordinate with Client to receive product for distribution within the United States and applicable foreign countries. Fulfillment services will include, but are not limited to the packaging of product, creation and application of mailing labels, packing slips and barcode labels. Every effort will be made to ship orders within forty-eight (48) hours of receipt of Customer credit card authorization and Client freight deposit, and in accordance with designated pricing, capacity and scheduled terms established by Moulton. First run of any new product will provide for seventy-two (72) hours from receipt of Customer credit card authorization and Client freight deposit to allow for testing and additional quality control, and to enable the documentation of procedures to be utilized for subsequent

Accepted by Moulton ___
Page 1 of 10                                                              Accepted by Client ___

production runs. Shipment is based upon available inventory and freight deposit, and will be shipped via carrier as agreed upon by both parties to this Agreement, using Moulton shipping accounts and rates as specified herewith in the applicable Attachments. In the event that a third party or Client account is utilized, a one-time setup fee (as specified, if applicable) and ongoing freight coordination charges (per carton) will be assessed. Freight coordination charges are billed weekly, and terms are net ten (10) days.

    a.  <u>Orders</u>. Moulton will coordinate with Client operations for telemarketing, direct mail, internet and other third parties as necessary to receive orders for processing. Moulton will notify Client of orders received, shipped and inventory levels required for pending orders as necessary.

    b.  <u>Payment</u>. Orders will be processed for payment prior to shipping, unless previously designated, or where Client has payment processed prior to Moulton receiving orders. No credit card will be debited unless there is available inventory and appropriate freight deposit at Moulton for immediate shipment. Checks will be deposited directly to Client bank account or mailed per instruction for Client deposit. Check orders will be held for fourteen (14) days for bank clearance prior to product shipment, unless otherwise designated in writing by Client. It is Client responsibility to notify Moulton of NSF checks within the specified number of days, as stated above. Taxes will be collected for the State of California and/or other states designated by Client. Client is responsible for the disposition of said taxes and should consult professional advice in these matters. Moulton requires Client California Resale Number to be on file prior to order processing.

    c.  <u>Credits and Returns</u>. Credits will be issued directly to Client Customer credit card on a weekly basis upon receipt of product for the purchase price, less shipping and handling, unless other Client instruction is provided in writing. Visa and MasterCard require that refunds be issued no more than thirty (30) days after receipt of return. Moulton will provide check refund information to Client. Client is responsible for issuing check refunds to Customers, unless otherwise instructed by Client in writing. Returned product received directly from Customer will be received at Moulton warehouse and either stored or refurbished, as agreed upon by Moulton and Client. Refurbishment of product will be at Client expense. Returned product not refurbished and/or removed from inventory will be disposed of by recycle, destruction or return to a Client designated location after thirty (30) days at Client expense. Returned Retailer product is not accepted without prior notification of and approval by Moulton. Client is responsible for any retail product return sent "Freight Collect" to Moulton. Client must provide Retailer with a third party account number for a carrier to return product to Moulton warehouse, or Moulton will deduct any applicable freight charges from Client Freight Deposit.

    d.  <u>Freight Deposit</u>. Client hereby agrees that all freight and postage charges are paid in advance. Client is required to provide a minimum Freight Deposit of no less than the average two-week volume of freight charges. Weekly estimated volumes will be established and agreed upon by Moulton and Client, and may be adjusted from time to time requiring the subsequent deposit of additional funds as needed. Deposits or reserves may also be established for services and storage at the sole discretion of Moulton. Client freight deposit will be held in a non-interest bearing demands account, and drawn upon by Moulton to cover Client freight expenses. Current estimated freight charges must be paid in advance by Client to Moulton no less than twenty-four (24) hours prior to product shipment unless otherwise agreed to in writing by Moulton. Any outstanding freight balance not covered by freight deposit must be paid within ten (10) days of invoice.

    e.  <u>Fulfillment Turnaround and Performance</u>. Moulton will make all best efforts to achieve levels of fulfillment performance to include:

        1.  Fulfillment of all orders received by electronic files (or EDI) no later than 8:00am (local time at Moulton shipping location) before close on the second business day, excluding orders which have its particulars modified after original receipt.

        2.  Fulfillment of all orders received by electronic files after 8:00am (local time at Moulton shipping location) before close on the third business day, excluding orders which have its particulars modified after original receipt.

        3.  Notification to Client of all warehouse receipts within two (2) regular business days.

Accepted by Moulton
Page 2 of 10

Accepted by Client

4. Provide complete processing of all product returns and appropriate notification to Client on a weekly basis.

Moulton will test and edit for proof of validity on client files and production received. Moulton will provide any necessary edits or corrections free of charge for a period of no more than thirty (30) days. After the initial test period of thirty (30) days, all Client data files received that require any and all editing or revisions for file validity will be either rejected back to Client, or accepted by Moulton and charged the current hourly programming rate to edit and repair. Client hereby agrees that in the event that Moulton is unable to meet fulfillment timelines due to the late receipt or quality of data files, Moulton will not liable for any costs incurred by Client. Moulton requires an initial EDI Trading Partner charge for set-up for both existing Moulton-approved trading partners and non-existing approved trading partners. Set-up charges for new partners (non-existing approved) will include all hourly programming, testing and implementation fees.

f. Delay Due to Late Receipt of Product, Materials and Information. In connection with shipments and processing to Client's retail customers, Moulton is not liable for Client failure to meet scheduled mailing dates for any purchase in which product, material, mailing list or any other information, including Client change of instruction or receipt of freight deposit, necessary for completion of said purchase is not received by Moulton no less than four (4) working days prior to the scheduled mailing date, unless Client authorizes Moulton to incur at Client expense such overtime labor and other charges as necessary to complete order.

g. Delay Due to Late Receipt of Data. Moulton is not liable for Client failure to transmit any and all data, either in a timely fashion or data that is not readily valid for order processing. Client will incur current hourly programming charges to edit for file validity.

h. Work Stoppage. Client is liable for any and all charges incurred for work begun on Client behalf and stopped prior to completion at no fault of Moulton. Charges will be determined based upon but not limited to expended labor and materials, including labor and material costs for receiving product back into inventory.

   1. Non-payment of Invoices. Moulton retains sole discretion to suspend all services, including access to Client data and database, in the event that Client account is not current, and will not resume work until Client account is brought to current terms. Additional monetary reserves may also be required, at the sole discretion of Moulton, for resumption of services to commence. Moulton is not liable for any and all charges incurred by Client for such stoppage.

i. Recalls and Extraordinary Events: In the event that a government agency, consumer agency or Client determines that the product is defective or unsaleable for any reason, separate arrangements must be made for the return, storage and disposition of that product, at Client expense. Moulton will not store unsaleable product in its warehouses, and Client agrees to remove any such product from Moulton possession no more than thirty (30) days after such date that condition becomes known.

5. Warehousing and Storage. Moulton will store all product and material in Moulton warehouse. Client shall pay storage charges as set forth in the applicable Attachments herewith. Moulton standard pallet charges are based upon pallets stacked four-high. In the event that Client inventory may be no more than double-stacked on pallet, rack or otherwise, Client hereby agrees that additional per pallet charges may apply. Moulton is liable for injury or damage to stored goods or property only if such injury or damage results from grossly negligent or willful acts of Moulton, or acts occurring during that time that Moulton has effective physical possession or control of Client product, and shall not in any event exceed the lesser of the reasonable cost of repairing damaged product, wholesale price of product at time of loss or damage occurred, Client internal cost to manufacture replacement products or the cost to replace damaged, lost or destroyed product with product of like kind and quality. The aforementioned cost will not include any allocated overheads, general design costs or other costs not specific to the actual replacement of Client product. Moulton is not liable for injury or damage to stored goods or property resulting from any other cause, including but not limited to actions by Client, Client employee or agent or any other third party; insects or vermin; depreciation or obsolescence, wear and tear; earthquake, flood weather or any act of God; fire, explosion, collapse of building or operation, failure or leakage of sprinkler system or roof; strike, war or civil unrest; breakage of glass or other fragile items, unless Moulton packed said items.

a.  Insurance. Client will carry and maintain commercial general liability insurance for product stored on Moulton premises or inbound containers to be unloaded at Moulton docks, and issue a Certificate of Insurance naming Moulton as additional insured. If Client does not provide insurance coverage to Moulton, client will indemnify Moulton for any out-of-pocket expenses, including attorney's fees. Client hereby agrees that Commercial General Liability Insurance (CGL) be written on an Occurrence Form basis including (a) products and completed operations liability; (b) broad form property damage liability and (c) broad form contractual liability. Client will also maintain Commercial Property Insurance, written on an "All Risk" basis with a limit equal to or greater than the amount of product stored at Moulton premises or inbound containers to be unloaded at Moulton docks. Moulton's insurance is secondary. Moulton will carry and maintain industry standard-form insurance coverage in the amount of $1,000 per pallet maximum ($100,000 lifetime maximum) to cover replacement costs. Client must provide Moulton with replacement cost of product and material prior to Moulton receipt of inventory. Moulton liability arising out of or in any way related to Moulton performance of service provided to Client shall be limited to general money damages in an amount not to exceed the price actually paid by Client to Moulton with respect to said services.

b.  Shrinkage. Moulton will make all best efforts to maintain a 98% inventory accuracy rate, with shrinkage less than 2% per year annualized per Client SKU.

c.  Warehouseman's Lien. Client hereby grants Moulton a General Lien against Client and all other persons or parties with respect to any and all Client property in Moulton possession, and on the proceeds from sale thereof, for all charges for storage, processing incidental to storage or transportation, including but not limited to demurrage and terminal charges, insurance, labor or charges present or future in relation to said property, and for expenses necessary for preservation of said property or reasonably incurred in their sale pursuant to law.

d.  Hazardous Goods. Moulton does not store or ship hazardous goods. If as a result of quality or condition of Client goods, of which Moulton had no notice at time of deposit, said goods are a hazard to other property or to persons, Moulton shall contact Client to remove said goods. Client hereby agrees to notify Moulton upon determination that goods are hazardous, and to remove same no later than five (5) days from date of determination. In the event that Client does not remove said goods, Moulton may sell Client goods at public or private sale without advertisement on reasonable notification to all persons or parties known to claim an interest in same. Should Moulton remain unable to sell Client goods after reasonable effort, Moulton may dispose of same in any lawful manner and shall incur no liability by reason of such disposition. Pending such disposition, sale or return of Client goods, Moulton shall incur no liability by reason of such removal.

e.  Right to Inspect. Client shall have the right from time to time to inspect Client product and material in Moulton possession. Client agrees to provide no less than one (1) business days' notice to Moulton. Client agrees that Client Right to Inspect does not constitute the audit of inventory or other inventory-related procedures.

f.  Inventory Audit. Moulton has established general inventory audit procedures that will be in use for Client inventory in Moulton possession. All SKUs will be counted no less than one (1) time during the course of any calendar year. Moulton employs an ongoing cycle-count program to ensure inventory accuracy and to make all best efforts to avoid a "stock-out" or an order that can not be filled due to inaccurate inventory. Moulton reserves the right to request specific inventory audit requirements in writing no less than one (1) month prior to the proposed audit date. Said notice is required to provide notice for additional staffing requirements as needed and to ensure no conflict with any other previously scheduled audit. Moulton and Client hereby agree that no inventory audit will commence unless Client account is current and in good standing.

   1.  Clean Cutoff. Moulton requires a "Clean Cutoff" to meet the requirements of Client audit, including a break in shipping and production, which allow for the reconciliation of any open Client orders and to conduct a count in the physical warehouse location from which inventory is generally shipped (also known as the ship location). Said break in shipping must occur for no less than a forty-eight (48) hour period in which no new orders will be released to the production floor and all outstanding orders must

Accepted by Moulton _____                                          Accepted by Client _____
Page 4 of 10

be either shipped or canceled depending upon status. Upon completion of order reconciliation, a physical count of the ship location may commence.

2. Physical Count. All rack, shelf, floor and bin locations can be counted and tagged, indicating the actual physical count. Counts will be determined by case quantity counts on all unopened cartons and unit counts on all opened cartons. Upon completion of all physical counts, an inventory system report will be generated indicating the levels reported on the Moulton inventory system. A check between the system report and the physical locations will be performed with any variance being recorded on the inventory tags. Discrepancies will be collected into a variance report, indicating the score of the overall audit.

3. Special Requests. Moulton will review and approve any additional audit requirements requested by Client, and Client hereby agrees to any additional costs associated with such requests, including but not limited to labor and materials, and any programming or data processing fees associated with Client-required reports.

6. Receipt and Inspection. Upon delivery of Client product or materials by carrier, Moulton shall unload same and visually inspect the outside of shipping containers for any noticeable damage and note same on shipping documents provided by the carrier. Moulton will visually inspect the condition of Client product or materials within the shipping containers, and to the extent possible, note any product or material that has escaped from containers, any noticeably damaged containers, or any containers missing product or materials. Moulton will make all best efforts to notify Client of any damaged product or materials prior to receiving into inventory. Moulton will promptly report to Client any shortages in quantities of product or materials received. Moulton will make every best effort to report to Client any damage to product or materials that Moulton may discover subsequent to Moulton acceptance from the carrier. Moulton shall not be obligated to inspect any Client product or materials for defect or damage which Moulton could not reasonably discover by external visual inspection of the shipping containers at the time of receipt of delivery. Further, Moulton is not liable for any concealed damage or concealed shortage of Client product or materials that are not detected through a visual review during the delivery process. Moulton shall not be liable for loss or damage to Client product or materials prior to their actual receipt by Moulton or after they are loaded on the carrier for delivery pursuant to Client instruction.

a. Hours for Receiving. Moulton standard hours of operation for receiving inventory are Monday through Friday, 7am-5pm PST. Moulton requires an accurate forty-eight (48) hour written Advance Shipping Notice (hereinafter "ASN") for all inbound Client inventory to be received by Moulton. Client inventory received outside of the stated standard hours will be subject to Premium Receiving Rates, and must be accompanied by accurate Moulton ASN. Without accurate ASN, Moulton reserves the right to refuse any Client inventory, and any and all charges incurred by Client, including but not limited to handling, storage and transportation costs, are the sole responsibility and liability of Client. Supplemental services provided on behalf of Client during non-standard or Premium Receiving periods, including but not limited to clerical requests and wait time will be billed at Premium rates, as stated in the applicable Attachment herewith.

b. Deep Storage Location. Moulton maintains a separate deep storage location. Client inventory may be stored from time to time at such location. Proper ASN notification is required to receive inventory, and written notice of no less than forty-eight (48) hours is required to transfer inventory to the main Moulton warehouse facility. Client inventory that is deemed "non-moving" for a period of ninety (90) days may be transferred to our deep storage facility. Deep storage pallet rates are charged at a reduced rate of regular pallet storage rates, however, transportation and handling fees may be assessed. Moulton will notify Client in advance of any transfer of inventory from main Moulton warehouse facility to deep storage location.

7. Customer Service. Moulton will establish a toll free line (800 or 888) for inbound customer service. Moulton reserves the right to change the hours of operation based upon inbound call volume. The standard hours of operation are Monday through Friday, 8am-5pm PST. Telephone service is provided by third party carriers, and Moulton disclaims any responsibility for malfunctions that may arise from outside installation and maintenance of these lines by any third party company. Client will provide initial and any required ongoing training for Moulton customer service personnel, relating specifically to Client product and procedure. In the event that Client does not provide said training, Moulton will render services and Client will be charged accordingly. Moulton will strive for a minimum of a 90% service

level rate for inbound customer service telephone calls. Please see Attachment F: "Enhanced Call Center Services" for specific additional services and fees available.

    a. Moulton will be closed for normal business on the following holidays (or the applicable Day of Observance):

> New Year's Day
> Memorial Day
> Independence Day
> Labor Day
> Thanksgiving Day
> Day After Thanksgiving Day
> Christmas Day

8. <u>Payment for Service</u>. All invoices are due upon receipt, but in no event may payment be made later than ten (10) days for services and ten (10) days for freight/postage expenses exceeding the balance in the reserve account. Moulton reserves the right to suspend all services if payment of invoice is not made within terms, and retains security interest in all Client product and material until accounts are current. Moulton, in its sole discretion, may impose a service charge of 1.5% per month of the outstanding balance remaining unpaid after the due date of any invoice. Should Moulton or Client ascertain that Moulton has erroneously billed Client for services, Moulton will create a Credit or Debit Note for the adjusted value and offset same against the original invoice(s), and such Credit or Debit Note will age concurrently with the original invoice(s). Moulton and Client hereby agree that any undercharge will have a maximum eighteen (18) month lookback period. In the event that Moulton has delivered a disputed invoice to Client, Client shall remit to Moulton the undisputed portion of such invoice, and Client and Moulton shall promptly work together to resolve the dispute. In those instances where any dispute is not resolved within a period of thirty (30) days, Client and Moulton will select a mutually acceptable third party to promptly arbitrate said dispute. Such decision made by third party will be binding.

9. <u>Warranties</u>. Moulton warrants that all services that it performs on behalf of Client, including but not limited to storage or warehousing services, will be performed in a competent and workmanlike manner, and that all products that it provides will be free of defects in material and workmanship for a period of thirty (30) days after mailing or shipping. Moulton obligation under the foregoing warranties is limited, at Moulton option, (i) for defective services to correct any error for which Moulton may be responsible, or monetary damages not to exceed the amount that the Client has actually paid Moulton for such services, or (ii) for defective products to repair, replace, or to refund the purchase price of the defective product up to the amount that the Client has actually paid Moulton for such product. Client shall make all warranty claims in writing to Moulton within a reasonable time after the discovery of the claimed defect, but in no event later than the expiration of the thirty (30) day warranty period. Client agrees that Moulton is not an insurer and does not protect Client against losses, damages, or liabilities of any kind or nature whatsoever arising out of the use by the Client of Moulton services.

    a. <u>Limitations of Warranties</u>. Moulton is providing the products and services to the Client pursuant to limited express warranties extended by Moulton. These limited express warranties provide a specific description of Moulton's legal responsibilities. Moulton disclaims the implied warranties of merchantability and fitness for a particular purpose stated in the Uniform Commercial Code because those warranties are unlimited in duration and uncertain of application. Client hereby agrees and acknowledges that Moulton would not provide the services to the Client for the purchase price but for the disclaimer of such implied warranties contained in this Section, and that providing the products and services to the Client pursuant to the Agreement in exchange for the disclaimer of such implied warranties and the other consideration given by Moulton constitutes a bargain that is fair and reasonable to the parties.

    b. <u>Indemnity by Moulton</u>. Moulton shall indemnify and defend Client and its officers, directors, agents and employees, and hold them harmless from and against all claims, suits, losses, liabilities, damages or expenses, including without limitation of costs of litigation (including appeal) and reasonable legal fees, arising from or in connection with any of the following: (i) any claim relating to personal injury, including death, or property loss or damage resulting from Moulton's negligent acts or omissions; and (ii) any action taken or failure to act by Moulton or on its behalf which constitutes willful misconduct or gross negligence on the part of Moulton or its employees or agents.

Accepted by Moulton
Page 6 of 10

Accepted by Client

FSA_01262006

    c.   <u>Indemnity by Client</u>.  Client shall indemnify and defend Moulton and its officers, directors, agents and employees, and hold them harmless from and against any and all claims, suits, losses, liabilities, damages or expenses, including without limitation storage, transportation and similar charges, costs of litigation including appeal, and legal fees arising from or in connection with any of the following: (i) any claim relating to personal injury, including death, or property loss or damage resulting from Client's negligent acts or omissions; (ii) any claim or other cause of action (a) involving a product liability claim arising from or relating to Products for which services are provided to Client hereunder, or (b) resulting from alleged defects in, or the inherently dangerous nature of Products that are the subject of this Agreement, or (c) relating to Client's right to sell and distribute Products that are the subject of this Agreement; (iii) any action taken or failure to act by Client or on its behalf which constitutes deliberate and willful misconduct or gross negligence on the part of Client or its employees or agents; and (iv) any claims, demands, or other assertions of rights adverse to the ownership and possession rights of Client made against Moulton.

10.  <u>Changes to Rate and Discount Schedules</u>.  Moulton retains the right to amend or supplement any Attachment herewith upon sixty (60) days written notice to Client. Moulton agrees to negotiate in good faith any Attachment changes in advance of providing such written notice to Client. Pricing is subject to yearly cost of living percentage increase, minimum wage increase or US Department of Labor for CPI for Los Angeles Urban Consumers. Increases in freight charges or accessorial (pass-through) charges by the carriers, including but not limited to Fuel Surcharges, will be amended to the applicable Attachment upon notification to Moulton by the carrier(s), without prior notice. Moulton shall promptly notify Client of any such noticed change received by Moulton in this regard.

11.  <u>Nondisclosure</u>.  Moulton and Client hereby acknowledge and agree that the following are confidential and proprietary information of the disclosing party:  (a) the type and amount of product received by Moulton, (b) the other party's pricing information regarding products and services, as applicable and (c) any other information regarding a party to this Agreement that is disclosed to the other but which is generally not known or available to the public. Each party agrees to hold in confidence and not to report, publish, disclose or transfer any such confidential and proprietary information to any person or entity without the other party's prior direction or consent, unless required to do so under applicable law or in furtherance of its obligations hereunder.

12.  <u>Independent Contractor Status</u>.  Moulton and Client are and at all times shall remain independent contractors as to each other. No joint venture, partnership, agency or other relationship which would impose liability upon one party for the act or failure to act of the other shall be created or implied by or from this Agreement. Each party acknowledges that to its knowledge, none of its respective officers, directors, employees or agents is covered under any employee benefit plans of the other party. Except as otherwise expressly set forth herein, each party shall bear full and sole responsibility for its own expenses, liabilities, trade creditors, employees, costs of operation and the like. Neither party has or shall have the power to bind the other party or to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of the other party.

13.  <u>Compliance with Moulton Standards and Client Standards of Operation</u>.  Moulton conducts its operations within the United States, so that it is and remains in full compliance with all laws of the United States in all aspects of its business. Moulton conducts itself and its operations to achieve the highest level of integrity and respect for human rights, including:

    a.   <u>Child Labor</u>.  Moulton will not employ any person under the age of sixteen or the legal age until after completion of compulsory education.

    b.   <u>Wages</u>.  Moulton pays its employees no less than the prevailing legal minimum wage, legally required benefits, mandated overtime rates and any other employment related benefits or requirements.

    c.   <u>Discrimination</u>.  Moulton does not discriminate in hiring, employment, promotion or other business practices on the grounds of religion, race, gender, national origin, sexual orientation, ethnic background or any other class or category as defined and protected by law.

    d.   <u>Health and Safety</u>.  Moulton follows all laws, including OSHA, State and Local, which detail how facilities and equipment must be set up to provide for a safe and secure working environment.

14. <u>Term of Agreement</u>.  Subject to the below subsections, this Agreement shall commence as of the Effective Date first set forth above in this Agreement, and shall terminate at midnight (Pacific Standard Time) immediately following the Termination Date also set forth above.

    a.  <u>Automatic Extension</u>.  Unless otherwise terminated prior to the Termination Date of this Agreement, or notice in writing is received by either party to this Agreement within ninety (90) days of the Termination Date, this Agreement shall remain in full force and effect for an additional term of one (1) year, until otherwise specified in writing.

    b.  <u>Period of Probation</u>.  Subject to test media or other production runs, this Agreement may be cancelled upon thirty (30) days written notice by either party to this Agreement. The Period of Probation commences upon the initial Effective Date of this Agreement only, and is not transferable or subject to extension or renewal.  In the event that either party elects to terminate this Agreement during said period, Client will be liable for all account set-up fees as well as any other service and freight charges, as well as account closing fees.  Additional service deposits may be required, subject to Moulton Logistics Management approval.  Client inventory, data and materials are subject to all applicable liens stated elsewhere in this Agreement.

    c.  <u>Termination Without Cause</u>.  Either party may terminate this Agreement upon ninety (90) days written notice.  All standard processing fees, monthly fees and minimums will still be applicable during the ninety (90) day closing period. All invoices must be current prior to the end of the ninety (90) days and should include any expected expenses relating to the closing of the account.  Upon receipt of written notice Moulton will prepare a memo outlining the procedure for closing the account.    A termination deposit is required to cover any unexpected expenses.  Said deposit shall be no less than the standard freight deposit plus one month's estimated services.  Moulton retains the right to require additional deposit as needed.

    d.  <u>Termination for Cause or Material Breach</u>.  In the event that either party to this Agreement creates a material breach of any term or condition of this Agreement, said party will be notified in writing as to such breach, at the address and manner as detailed in this Agreement. The party causing said breach shall then have thirty (30) calendar days after the date of notification to cure to full satisfaction of the breached party.  In the event that the breach is not cured to the satisfaction of the breached party after thirty days, the breached party may terminate this Agreement immediately upon written notice to the party in breach. Moulton may also terminate this Agreement as the result of any repeated failure by Client to pay Moulton invoices within terms of this Agreement.

    e.  <u>Termination for Other Events</u>.  In the event that one party to this Agreement shall be adjudicated a bankrupt, institute voluntary proceeding for bankruptcy or reorganization, make an assignment for the benefit of its creditors, apply for or consent to the appointment of a receiver for it or its property, or admit in writing its inability to pay its debts as they become due, the other party shall have the right to terminate this Agreement immediately upon written notice to the party to which such event has occurred.

    f.  <u>Return of Product Following Termination</u>.  Moulton shall have the right to return to Client by common carrier at sole expense of Client any product remaining in Moulton possession following termination of this Agreement for any reason.  Client agrees to pay, in advance, all costs of storage, processing, labor, materials and any and all other charges incurred by Moulton.

    g.  <u>Arbitration.</u>  Any controversy or claim arising out of or related to this Agreement or breach thereof, except when injunctive relief or specific performance is sought, shall be settled by arbitration.  The office of the American Arbitration Association will arbitrate said controversy or claim, with jurisdiction in Los Angeles, California. In the event that a dispute is submitted to arbitration, the arbitrator may award costs and reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be of the same force and effect as a final enforceable judgment of a court of competent jurisdiction.

    h.  <u>Consequential Damages</u>.    Notwithstanding anything to the contrary contained in this Agreement, in no event shall Moulton be liable to Client or any third party for incidental, consequential or punitive damages, including without limitation lost profits.

15. <u>Entire Agreement</u>.    Any Attachment pertaining to this Agreement and attached hereto will be incorporated herein by reference and expressly made a part of this Agreement.  This Agreement, including its Attachments, constitutes the entire agreement between Moulton and Client hereto with

Accepted by Moulton
Page 8 of 10

Accepted by Client

respect to the subject matter hereof.  This Agreement supersedes all prior negotiations, letters, agreements and understandings relating to the subject matter hereof without limitation.

    a.    Partial Invalidity.  In the event that any provision of this Agreement shall be held to be invalid or unenforceable by any court of competent jurisdiction, then the validity and enforceability of such provision as applied to any other particular facts or circumstances, and the validity of other provisions of this Agreement shall not in any way be affected or impaired thereby.  In the event that a court of competent jurisdiction finds any of the provisions herewith to be so over broad in scope as to be unenforceable, such provisions may be reduced in scope by the court to the extent deemed necessary to render such provision reasonable and enforceable.

    b.    Binding Effect.  This Agreement is entered into for the benefit of the parties and no provision thereof shall be interpreted or construed as creating any right of enforcement or cause of action on the part of any person who is not a party hereto.  Notwithstanding the foregoing, but subject to the above, this Agreement shall inure to the benefit of, and shall be binding upon, the successors and permitted assigns of the parties.

16.  Force Majeure.  Moulton shall not be held in breach of this Agreement for any delay or failure in providing Client the services required under this Agreement for a period of thirty (30) days due to Acts of God, strike, riot, war, shortages or natural disasters over which Moulton has no control or can not reasonably anticipate or prevent.  Should Force Majeure conditions continue for a period of more than thirty (30) days from the date upon which the event is first known or should have been known, Client shall have the right to terminate this Agreement, subject to the terms and conditions as stated above.

17.  Notices.  Any Notice to be given pursuant to this Agreement shall be in writing and shall be deemed to have been given at the earliest of (i) the time when delivered in person or via messenger to the persons identified below, (ii) actual receipt by the addressee, (iii) five (5) days after deposit in the US Mail, when sent postage prepaid and addressed to the intended recipient at the applicable address appearing below, or (iv) upon facsimile transmission to the number specified below, provided a contemporaneous facsimile confirmation is received.  Each party may change its address and/or facsimile number for purposes of this paragraph by notice to the other party as provided herein.

If to Moulton, notices shall be sent to:

        Mr. Larry Moulton, President
        Moulton Logistics Management
        7850 Ruffner Avenue
        Van Nuys, CA  91406
        Telephone Number    (818) 997-1800
        Facsimile Number    (818) 997-8522

If to Client, notices shall be sent to:

        Mr. Bryan Sweeny
        Greenhouse International, LLC
        300 Creek View Road
        Suite 101
        Newark, DE  19711

        Telephone Number:    (302) 454-8334
        Facsimile Number:    (302) 454-8126

Accepted by Moulton
Page 9 of 10

Accepted by Client

18. <u>Authorized Signatures</u>.  For the purpose of binding the parties to the above Fulfillment Services Agreement, the parties or their duly authorized representatives have signed their names below.

Moulton Logistics Management

By: _____      Dated: 8/16/06
        Larry Moulton, President

Greenhouse International, LLC

By: _____      Dated: 6/26/06
        Chris Lundin, CEO

# Exhibit B

NEVERS

PALAZZO

MADDUX

—— & ——

PACKARD

A Professional Law Corporation

————————————————————————

31248 Oak Crest Drive, Suite 100, Westlake Village, California 91361
(818)879-9700  (805)495-0700   Fax (818)879-9680 Fax (805)495-4440

MICHAEL S. WILDERMUTH
mswildermuth@npmp.com

November 28, 2007

**_Via Facsimile (302) 661-7723 and U.S. Mail_**

James M. Lennon, Esq.
Womble, Carlyle, Sandridge & Rice
222 Delaware Avenue
Wilmington, DE 19801

      Re:    Greenhouse International, LLC v. Moulton Logistics Management, Inc., Civil
              Action No. 07-CV-00722

Dear Mr. Lennon:

      We represent Moulton Logistics Management in connection with the ongoing dispute
between Moulton Logistics Management, Inc. ("Moulton") and Greenhouse International, LLC
("Greenhouse") regarding the July 1, 2006 Fulfillment Services Agreement (the "Agreement").
Moulton was surprised to receive the lawsuit filed by Greenhouse considering that the parties
resolved the then-pending disputes concerning the Agreement in July 2007. Moulton informs us
that the allegations in the complaint are without merit and Moulton intends to pursue all avenues
for redress, including through the filing of a malicious prosecution action at the appropriate time.
Moulton also disputes that Delaware is the proper venue or that the Delaware court has personal
jurisdiction over Moulton.

      More importantly, the Agreement includes an arbitration provision in Paragraph 14.g.
that requires the parties to arbitrate all dispute arising under the Agreement in Los Angeles,
California through the American Arbitration Association offices in Los Angeles. Under this
provision and the applicable law, the only avenue for redress of any claims under the Agreement
is through a binding arbitration in Los Angeles, California.

      Accordingly, we insist that you immediately file a dismissal of the above action as is
required under California law and the Federal Arbitration Act. Otherwise, Moulton will file an
original proceeding in California state court to compel the arbitration and, additionally, it will
file a petition in the federal action seeking the same relief under the Federal Arbitration Act.
Moulton will seek the recovery of its attorney's fees in connection with these provisions in the
event that Greenhouse refuses to comply with the requirement to arbitrate the alleged dispute.



Exhibit    5

James M. Lennon, Esq.
November 28, 2007
Page 2


     Please immediately confirm that you have dismissed the federal lawsuit and we can then discuss the timing of an arbitration and the selection of an arbitrator in California. If we do not receive confirmation of the dismissal by close of business on Monday December 3, 2007, we will proceed with the motion to dismiss and petitions to compel arbitration as discussed above.

               Very truly yours,

               Michael S. Wildermuth
               of Nevers, Palazzo, Maddux & Packard, PLC

MSW/lm

cc:    Larry Moulton, Moulton Logistics Management
      Tony Sziklai, Moulton Logistics Mangement
      Donald J. Palazzo, Esq.
      Dexter Hamilton, Esq., Cozen O'Connor

W:\WORKING\13414\01\W0065463.DOC

# Exhibit C

1  MICHAEL S. WILDERMUTH, ESQ., SB#143758
   MARK S. REUSCH, ESQ., SB#210679
2  NEVERS, PALAZZO, MADDUX & PACKARD, PLC
   31248 Oak Crest Drive, Suite 100
3  Westlake Village, California 91361
   Telephone: (818) 879-9700
4  Facsimile: (818) 879-9680

5  Attorneys for Petitioner Moulton Logistics
   Management, Inc.

6

7

8

9                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

10            FOR THE COUNTY OF LOS ANGELES, NORTHWEST DISTRICT

11
   MOULTON LOGISTICS MANAGEMENT,          CASE NO. LC080008
12 INC.,

13            Petitioner,                  PETITION TO COMPEL BINDING
                                           ARBITRATION; MEMORANDUM OF
14     vs.                                 POINTS AND AUTHORITIES;
                                           DECLARATION OF ANTHONY SZIKLAI;
15 GREENHOUSE INTERNATIONAL, LLC,          DECLARATION OF MICHAEL S.
                                           WILDERMUTH
16            Respondent.

17                                         Discovery Cutoff:    None Set
                                           Motion Cutoff:       None Set
18                                         Trial Date:          None Set

19

20       Petitioner Moulton Logistics Management, Inc. ("Petitioner") hereby petitions the Court to

21 compel a binding arbitration against Respondent Greenhouse International, LLC ("Respondent") with

22 respect to the claims of Respondent as set forth in their Complaint filed in the United States District

23 Court, District of Delaware ("Complaint") pursuant to the terms of a written contract, the Federal

24 Arbitration Act ("FAA"), 9 U.S.C. §4 and California Code of Civil Procedure §1281.2 et seq., based

25 on the following information:

26       1.       On July 1, 2006, Petitioner and Respondent entered into a written Fulfillment Services

27 Agreement ("Agreement") wherein Petitioner agreed to provide fulfillment and other related services

28 to Respondent for the sale and distribution of Respondent's products, the Bean and Flex 10. A copy of

---

1
PETITION TO COMPEL BINDING ARBITRATION

1    the Agreement is attached to the Declaration of Anthony Sziklai as Exhibit "1." The Agreement was

2    entered in Los Angeles County, California, Respondent manufactured the products in Los Angeles,

3    California, and Petitioner received all orders and shipped all of Respondent's products from its

4    warehouse in Van Nuys, California.

5        2.    Paragraph 14.g of the Agreement provides as follows:

6            "g. Arbitration. Any controversy or claim arising out of or related to
7            this Agreement or breach thereof, except when injunctive relief or
        specific performance is sought, shall be settled by arbitration. The
8            office of the American Arbitration Association will arbitrate said
        controversy or claim, with jurisdiction in Los Angeles, California. In
9            the event that a dispute is submitted to arbitration, the arbitrator may
        award costs and reasonable attorney's fees to the prevailing party. The
        award of the arbitrator shall be of the same force and effect as a final
10           enforceable judgment of a court of competent jurisdiction."

11       3.    On November 9, 2007, Respondent filed a civil complaint in the United States District

12   Court, District of Delaware. Respondent served the Complaint by mail on November 19, 2007,

13   shortly before the Thanksgiving holiday. In filing the Complaint, Respondent ignored the arbitration

14   provisions in the Agreement. All of the claims in the Complaint "arise[] out of or relate[] to th[e]

15   Agreement or breach thereof", where Respondent claims that Petitioner misappropriated Respondent's

16   trade secrets, breached the Agreement and interfered with Respondent's business allegedly as a direct

17   result of Petitioner's fulfillment work under the Agreement. (A copy of the Complaint is attached to

18   the Declaration of Anthony Sziklai as Exhibit "2".) Respondent seeks monetary damages for these

19   claims.

20       4.    On November 28, 2007, Petitioner demanded that Respondent proceed with an

21   arbitration of the controversy in the manner provided in Paragraph 14.g. of the Agreement.

22   Respondent has refused, and continues to refuse, to do so, and Respondents have refused to dismiss

23   the Complaint. On or before December 24, 2007, Petitioner will file a motion to stay the Complaint

24   pending in the District Court in Delaware under the terms of the Federal Arbitration Act.

25       5.    The Agreement requires Petitioner and Respondent to arbitrate the matter. Petitioner

26   requests an order from this Court that its dispute with Respondent be ordered into binding arbitration

27   in Los Angeles, California with the American Arbitration Association ("AAA") as required by the

28   Agreement.

1    6.    The Petitioner has not waived its right to arbitrate this matter pursuant to the terms of

2    the Agreement.

3    7.    Wherefore, Petitioner prays that the Court set this Petition for hearing and that at such

4    hearing an order compelling Respondent to arbitrate all of the claims raised in Respondent's

5    Complaint against Petitioner in Los Angeles, California with the AAA and that Petitioner be granted

6    such other and further relief as the Court may deem proper.

7    Dated: December 17, 2007                    Nevers, Palazzo, Maddux & Packard, PLC

8

9                                               By: _____

10                                                  Michael S. Wildermuth
                                                   Mark S. Reusch
11                                                 Attorneys for Petitioner Moulton Logistics
                                                   Management, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Petitioner Moulton Logistics Management, Inc. ("Petitioner") respectfully submits this Memorandum of Points and Authorities in support of its Petition to Compel Binding Arbitration.

## 1.    PRELIMINARY STATEMENT

It is undisputed that the Fulfillment Services Agreement ("Agreement") between Petitioner and Respondent Greenhouse International, LLC ("Respondent") requires the parties to arbitrate all disputes arising out of or in connection with the Agreement. Rather than arbitrate certain claims between the parties relating to the Agreement, Respondent instead improperly filed a civil lawsuit in Federal District Court in the state of Delaware ("Complaint") where Respondent is incorporated.

Paragraph 14.g of the Agreement provides as follows:

> "g. Arbitration. Any controversy or claim arising out of or related to this Agreement or breach thereof, except when injunctive relief or specific performance is sought, shall be settled by arbitration. The office of the American Arbitration Association will arbitrate said controversy or claim, with jurisdiction in Los Angeles, California. In the event that a dispute is submitted to arbitration, the arbitrator may award costs and reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be of the same force and effect as a final enforceable judgment of a court of competent jurisdiction."

All of the claims in the Complaint "arise[] out of or relate[] to th[e] Agreement or breach thereof". In the Complaint, Respondent alleges that Petitioner misappropriated Respondent's trade secrets, engaged in deceptive trade practices and breached provisions of the Agreement in connection with Petitioner's fulfillment work for Respondent under the Agreement. The primary remedy Respondent seeks in the Complaint is monetary damages.

Respondents may not "pick and choose" the terms of the Agreement they wish to honor while at the same time suing Petitioner in a foreign court for alleged breaches of the Agreement. Respondent agreed in writing to pursue its claims against Petitioner in arbitration. Respondent is not permitted to simply refuse the arbitration process. Further, all of the applicable law requires that Respondent's agreement to arbitrate be enforced. Additionally, public policy strongly favors the enforcement of Respondent's agreement to arbitrate. Finally, the arbitration process is the most economical and expedient means of resolving this contractual dispute.

Accordingly, the Court should compel the Respondent to arbitrate their claims against

1   Petitioner with the AAA in Los Angeles, California, consistent with the terms of the Agreement.

2   **2.    FACTUAL BACKGROUND**

3        On July 1, 2006, Petitioner and Respondent entered into the Agreement wherein Petitioner

4   agreed to provide fulfillment and other related services to Respondent for the sale and distribution of

5   Respondent's products, the Bean and Flex 10. (Sziklai Declaration, Exhibit "1", ¶2.) The Agreement

6   was entered in Los Angeles County, California, Respondent manufactured the products in Los

7   Angeles, California, and Petitioner received all orders and shipped all of Respondent's products from

8   its warehouse in Van Nuys, California. (Ibid.)

9        Paragraph 3 of the Agreement provides that Petitioner will receive and process orders and

10   update customer information from Respondent's multiple sources, and provide "backend" customer

11   service for calls pertaining to shipping information, refunds and standard customer service questions.

12   (Anthony Sziklai Decl., Exhibit "1", ¶2.) Paragraph 4 of the Agreement provides that Petitioner will

13   provide fulfillment services which included packaging of the product, creation and application of

14   mailing labels, packing slips and barcode labels. (Ibid.)

15        The disputes between the parties clearly arise out of and are related directly to the Agreement

16   and the parties' performance (or lack thereof) of the terms of the Agreement. (Sziklai Dec., ¶3.) In

17   that regard, from the inception of the Agreement, Respondent did not timely make all of the payments

18   required by it to Petitioner in the time and manner required by the Agreement.  Unfortunately,

19   Respondent was consistently late in meeting its payment obligations, where at times the overdue

20   amount exceeded $400,000. (Ibid.) In order to ensure payment by Respondent, on several occasions

21   Petitioner informed Respondent that Paragraph 4(h)(1) of the Agreement permitted Petitioner to

22   suspend all services related to Respondent's account.  Paragraph 4(h)(1) provides that:

23       "Moulton retains sole discretion to suspend all services, including access to Client data
    and database, in the event that Client account is not current, and will not resume work
24       until Client account is brought to current terms.  Additional monetary reserves may
    also be required, at the sole discretion of Moulton, for resumption of services to
25       commence.  Moulton is not liable for any and all charges incurred by Client for such
    stoppage." (Ibid.)

26
     Through various good faith attempts to retain the relationship, Petitioner attempted to work
27
with Respondent to keep the shipments flowing while at the same time, to encourage Respondent to
28

1  bring the account current. (Sziklai Dec., ¶3.) Respondent did not make the same effort to honor its

2  contractual obligations under the Agreement. (Ibid.) Instead, Respondent gave notice to terminate

3  the Agreement effective July 31, 2007, where it decided to use a new fulfillment company for its

4  products. (Ibid.)

5      As of July 12, 2007, Respondent owed Petitioner over $105,000 in past due invoices. (Id. at

6  ¶4.) As a result, Petitioner put Respondent on notice that Petitioner was enforcing the terms of the

7  Agreement, requiring that Respondent pay all past-due invoices in full and requiring that all future

8  services that may be required by Respondent, including freight and services, be pre-paid. (Ibid.)

9  Rather than pay what was owed, Respondent continued to make excuses as to why it could not pay the

10 full amount owed at that time. (Ibid.; Wildermuth Decl., Exhibits "3" and "4", ¶2.) Respondent

11 ultimately paid $100,000 towards the amounts owing and Petitioner cooperated in the transition of the

12 business to the new fulfillment company, including through the delivery of the inventory and the

13 customer database, and it processed certain remaining orders. (Ibid.) Petitioner believed the matter

14 was resolved as of that time. (Ibid.)

15     Without any further notice, on November 9, 2007, Respondent filed its Complaint, alleging

16 that Petitioner misappropriated Respondent's trade secrets, tortiously interfered with Respondent's

17 business, violated §1125(a)(1)(A) of the Lanham Act, engaged in deceptive and unfair trade practices

18 and breached several provisions of the Agreement. (Sziklai Decl. Exhibit "2", ¶5.)

19     On November 28, 2007, Petitioner made a demand to Respondent to submit its claims to

20 arbitration and to dismiss its Complaint. (Sziklai Decl., ¶6; Wildermuth Decl. Exhibit "5", ¶3.)

21 However, Respondent refused and continues to refuse to submit its claims to arbitration pursuant to

22 the Agreement. (Ibid.) Since the arbitration provision from the Agreement calls for arbitration to be

23 conducted by the American Arbitration Association with jurisdiction in Los Angeles, California, the

24 arbitration should be conducted in Los Angeles, California and not in a civil lawsuit Delaware.

25     Wherefore, Petitioner prays that the Court set this Petition for hearing and that at such hearing

26 that an order be issued compelling Respondent to arbitrate all of the claims in Respondent's Federal

27 District Court complaint against Petitioner in Los Angeles, CA with AAA and that Petitioner be

28 granted such other and further relief as the Court may deem proper.

1

2    3.    **ARGUMENT**

3        A.    <u>**The Arbitration Process is Required by Contract and Law**</u>

4            1.    <u>The Federal Arbitration Act Applies to the Parties' Arbitration Agreement</u>

5        The Federal Arbitration Act (hereinafter "FAA") applies to a contract "evidencing a

6    transaction involving commerce" and compels state courts to enforce private arbitration agreements.

7    See 9 U.S.C. §2.  State courts "may not ... invalidate arbitration agreements under state laws

8    applicable only to arbitration provisions." <u>Doctor's Associates, Inc. v. Casarotto</u> (1996) 517 U.S. 681,

9    686-687.

10        There is no question that the FAA applies to the Agreement at issue in this case.  The

11    Agreement involves the assistance by Petitioner with the sale of Respondent's goods through interstate

12    commerce.  In <u>Basura v. U.S. Home Corporation</u> (2002) 98 Cal. App. 4th 1205, 1213, the developer

13    had sales agreements with the plaintiff that included an arbitration clause.  The court in <u>Basura</u> held

14    that because the homes which U.S. Home Corporation built and sold to plaintiff involved interstate

15    commerce, the agreements were covered by the FAA. <u>Id.</u> at 1214.  In the case, U.S. Home presented

16    evidence that the receipt and use of building materials and equipment were manufactured and/or

17    produced in states outside California, that it communicated by interstate mail and telephone and

18    engaged in marketing and advertising throughout the country using interstate media.

19        Petitioner's and Respondent's business activities generally effect interstate commerce.

20    Respondent markets its products throughout the country. Petitioner received orders for those products

21    on behalf of Respondent from around the country and shipped Respondent's products to customers in

22    various states.  For these reasons, the subject Agreement is clearly governed by the FAA.

23            2.    <u>The Arbitration Agreement is Enforceable Under the Federal Arbitration Act</u>

24        Respondent is improperly attempting to sue Petitioner in United States District Court, District

25    of Delaware, claiming breach of the Agreement, and various other related causes of action, while

26    simultaneously refusing to honor the terms of the Agreement.  Here, the arbitration provision in the

27    Agreement on which Respondent sues requires that such claims be arbitrated.

28        Under the Federal Arbitration Act, a court is required to compel the parties to a written

---

4

1  arbitration agreement to arbitrate disputes covered by that agreement – the court does not have

2  discretion to do otherwise. <u>Dean Witter Reynolds Inc. v. Byrd</u> (1985) 470 U.S. 213, 218 (FAA

3  "leaves no place for the exercise of discretion"); <u>Chiron Corp. v. Ortho Diagnostic Systems, Inc.</u> (9th

4  Cir. 2000) 207 F.3d 1126, 1130. To grant a party's motion to compel arbitration, a court must find:

5  (1) an enforceable agreement to arbitrate exists, and (2) the claims sought to be arbitrated are

6  encompassed within the scope of the arbitration clause. <u>Chiron</u>, <u>supra</u>, 207 F.3d at 1130; <u>Simula, Inc.</u>

7  <u>v. Autoliv, Inc.</u> (9th Cir. 1999) 175 F.3d 716, 719-720. Once these elements are established, such

8  agreements are rigorously enforced. <u>Simula</u>, <u>supra</u>, 175 F.3d at 719. The existence and scope of an

9  arbitration agreement must be determined before other issues; if there is an issue of fact, "the court

10  shall proceed summarily to the trial thereof." 9 U.S.C. §4. These elements are determined according

11  to the applicable contract law standards of the jurisdiction. <u>Chelsea Squares Textiles, Inc. v. Bombay</u>

12  <u>Dyeing and Mfg. Co., Ltd.</u> (2d Cir. 1999) 189 F.3d 289, 295-296.

13         The Agreement contains a written arbitration provision, which requires both parties to arbitrate

14  "any controversy or claim arising out of or related to this Agreement or breach thereof." The

15  Agreement is the basis for all of Respondents causes of action in its lawsuit filed in the Federal

16  District Court. As set forth in the Agreement:

17         "Any controversy or claim arising out of or related to this Agreement or breach
           thereof, except when injunctive relief or specific performance is sought, shall be
18         settled by arbitration. The office or the American Arbitration Association will
           arbitrate said controversy or claim, with jurisdiction in Los Angeles, California. In the
19         event that a dispute is submitted to arbitration, the arbitrator may award costs and
           reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be
20         of the same force and effect as a final enforceable judgment of a court of competent
           jurisdiction." (Anthony Sziklai Decl., ¶2, Exhibit "1.")
21

22         Each of the parties initialed the bottom of the page which contained the arbitration provision in

23  the Agreement. In this case, the Agreement is unequivocal that arbitration of the Respondent's (as

24  well as Petitioner's cross-claims) arising from the alleged breaches of the Agreement is required by the

25  Agreement. The provision for arbitration in the Agreement is broad, calling for arbitration of all

26  claims arising out of or related to this Agreement or breach thereof, and it should be construed

27  liberally. <u>Simula</u>, <u>supra</u>, 175 F.3d at 716 (liberally interpreting scope of clause calling for arbitration

28  of "[a]ll disputes arising in connection with this Agreement"). The presumption in favor of arbitration

1   is even stronger when the scope of the arbitration agreement is broad.  <u>Dennis L. Christensen Gen.</u>

2   <u>Bldg. Contractor, Inc. v. Southern Cal. Conference of Carpenters</u> (9th Cir. 1991) 952 F.2d 1073, 1077.

3          Because the Agreement between Petitioner and Respondent requires arbitration of any and all

4   claims, and because Federal law clearly makes such agreements enforceable, Petitioner requests that

5   the Court compel Respondent to arbitrate their claims in their currently pending Federal District Court

6   complaint.

7              3.      <u>The Arbitration Agreement Is Enforceable Under California Law</u>

8          Where parties have agreed to arbitrate their differences, it is the clear intent of arbitration

9   statutes in California that courts should enforce performance of that agreement. <u>Cione v. Foresters</u>

10  <u>Equity Services</u> (1997) 58 Cal. App. 4th 625, 68 Cal. Rptr. 2d 167.  The policy and practice was well

11  stated by the California Court of Appeal for the Second District, as follows:

12         "... [T]he legislature has expressed a strong public policy in favor of arbitration as a
           speedy and relatively inexpensive means of dispute resolution. As a result, courts will
13         indulge every intendment to give effect to such proceedings. (citation omitted)
           'Indeed, more than 70 years ago this court explained: 'The policy of the law in
14         recognizing arbitration agreements and in providing by statute for their enforcement is
           to encourage persons who wish to avoid delays incident to a civil action to obtain an
15         adjustment of their differences by a tribunal of their own choosing' (<u>Utah Const. Co. v.</u>
           <u>Western Pac. Ry. Co.</u> (1916) 174 Cal. 156, 159 [162 P. 631]. Typically, those who
16         enter into arbitration agreements expect that their dispute will be resolved without
           necessity for any contact with the courts'". <u>Valsan Partners v. Calcor Space Facility</u>
17         (1994, 2nd Dist.) 25 Cal.App. 4th 809, 816, 30 Cal. Rptr. 2d 785.

18  Code of Civil Procedure Section 1281.2 provides:

19         "On petition of a party to an arbitration agreement alleging the existence of a written
           agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such
20         controversy, the court shall order the petitioner and the respondent to arbitrate the
           controversy if it determines that an agreement to arbitrate the controversy exists,
21         unless it determines that:

22         (a)     The right to compel arbitration has been waived by the petitioner; or

23         (b)     Grounds exist for the revocation of the agreement.

24         (c)     A party to the arbitration agreement is also a party to a pending court action or
           special proceeding with a third party, arising out of the same transaction or series of
25         related transactions and there is a possibility of conflicting rulings on a common issue
           of law or fact. For purposes of this section, a pending court action or special
26         proceeding includes an action or proceeding initiated by the party refusing to arbitrate
           after the petition to compel arbitration has been filed, but on or before the date of the
27         hearing on the petition....

28         . . .

                                          6
                        PETITION TO COMPEL BINDING ARBITRATION

1         If the court determines that a party to the arbitration is also a party to litigation in a

2         pending court action or special proceeding with a third party as set forth under subdivision (c) herein, the court (1) may refuse to enforce the arbitration agreement

3         and may order intervention or joinder of all parties in a single action or special proceeding; (2) may order intervention or joinder as to all of only certain issues: (3)

4         may order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration

5         proceeding; or (4) may stay arbitration pending the outcome of the court action or special proceeding."

6         Here, there is no question that the disputes between the parties involving the Agreement must

7 be arbitrated under the terms of the Agreement.

8     **B.**    **Public Policy Strongly Favors Enforcement of Arbitration Provisions**

9         In determining whether a dispute is arbitrable, courts must consider the FAA's strong public

10 policy favoring arbitration over litigation. See Moses H. Cone Memorial Hospital v. Mercury

11 Construction Corp. (1983) 460 U.S. 1, 24 ("[9 U.S.C. section 2] is a congressional declaration of a

12 liberal federal policy favoring arbitration agreements."). As mentioned above, "any doubts concerning

13 the scope of arbitrable issues should be resolved in favor of arbitration." Id. at 24-25; Simula, supra,

14 175 F.3d at 719; Wolsey, Ltd. v. Foodmaker, Inc. (9th Cir. 1998) 144 F.3d 1205, 1209 (arbitration

15 need not be binding to fall under FAA); Ever-Gotesco Resources and Holdings, Inc. v. Pricesmart,

16 Inc. (S.D. Cal. 2002) 192 F.Supp. 2d 1040, 1042; citing Simula and Moses Cone.

17         The presumption in favor of arbitrability is strong. When an agreement has an arbitration

18 clause, arbitration should not be denied "unless it may be said with positive assurance that the

19 arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT&T

20 Technologies, Inc. v. Communications Workers of America (1986) 475 U.S. 643, 650. "Doubts

21 should be resolved in favor of coverage." Id.

22         Petitioner's and Respondent's Agreement to arbitrate their claims must be enforced under the

23 FAA and California law. All of Respondent's Complaint are all based on various alleged breaches of

24 the Agreement by Petitioner. Respondent cannot truthfully allege its full compliance with the

25 Agreement while continuing to disregard the arbitration provision set forth in paragraph 14.g of the

26 Agreement.

27 ///

28 ///

1    4.    **CONCLUSION**

2           For the reasons stated above, the Court should issue an Order compelling Respondent to

3    arbitrate all of the claims raised in Respondent's Complaint against Petitioner in Los Angeles,

4    California with the AAA under the terms of the Agreement.

5    Dated: December 17, 2007              Nevers, Palazzo, Maddux & Packard, PLC

6

7                                          By: _____

8                                              Michael S. Wildermuth
                                                Mark S. Reusch
9                                              Attorneys for Petitioner Moulton Logistics
                                                Management, Inc.

10   W:\WORKING\13414\01\W0065519.DOC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attachments to Exhibit C are Intentionally Omitted

# Exhibit D

## DECLARATION OF ANTHONY SZIKLAI

I, Anthony Sziklai, declare as follows:

1.    I am an officer of Petitioner Moulton Logistics Management, Inc. ("Petitioner") in the above-entitled action. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

2.    On July 1, 2006, Petitioner and Respondent entered into a written Fulfillment Services Agreement ("Agreement") wherein Petitioner agreed to provide fulfillment and other related services to Respondent for the sale and distribution of Respondent's products, the Bean and Flex 10. A true and correct copy of the Agreement is attached hereto as Exhibit "1." The Agreement was entered in Los Angeles County, California, Respondent manufactured the products in Los Angeles, California, and Petitioner received all orders and shipped all of Respondent's products from its warehouse in Van Nuys, California. Paragraph 3 of the Agreement provides that Petitioner will receive and process orders and update customer information from Respondent's multiple sources, and provide "backend" customer service for calls pertaining to shipping information, refunds and standard customer service questions. Paragraph 4 of the Agreement provides that Petitioner will provide fulfillment services which included packaging of the product, creation and application of mailing labels, packing slips and barcode labels. The arbitration provision, which is contained in Paragraph 14.g, provides as follows:

> "Any controversy or claim arising out of or related to this Agreement or breach thereof, except when injunctive relief or specific performance is sought, shall be settled by arbitration. The office or the American Arbitration Association will arbitrate said controversy or claim, with jurisdiction in Los Angeles, California. In the event that a dispute is submitted to arbitration, the arbitrator may award costs and reasonable attorney's fees to the prevailing party. The award of the arbitrator shall be of the same force and effect as a final enforceable judgment of a court of competent jurisdiction."

3.    The disputes between the parties clearly arise out of and are related directly to the Agreement and the parties' performance (or lack thereof) of the terms of the Agreement. In that regard, from the inception of the Agreement, Respondent did not timely make all of the payments required by it to Petitioner in the time and manner required by the Agreement. Unfortunately, Respondent was consistently late in meeting its payment obligations, where at times the overdue amount exceeded $400,000. In order to ensure payment by Respondent, on several occasions

1 | Petitioner informed Respondent that Paragraph 4(h)(1) of the Agreement permitted Petitioner to

2 | suspend all services related to Respondent's account.  Paragraph 4(h)(1) provides that:

3 |     "Moulton retains sole discretion to suspend all services, including access to Client data
and database, in the event that Client account is not current, and will not resume work

4 |     until Client account is brought to current terms.  Additional monetary reserves may
also be required, at the sole discretion of Moulton, for resumption of services to

5 |     commence.  Moulton is not liable for any and all charges incurred by Client for such
stoppage."

6 |

7 |     Through various good faith attempts to retain the relationship, Petitioner attempted to work

8 | with Respondent to keep the shipments flowing while at the same time, to encourage Respondent to

9 | bring the account current.  Respondent did not make the same effort to honor its contract obligations

10 | under the Agreement.  Instead, Respondent gave notice to terminate the Agreement effective July 31,

11 | 2007, where it decided to use a new fulfillment company for its products.

12 |     4.    As of July 12, 2007, Respondent owed Petitioner over $105,000 in past due invoices.

13 | As a result, Petitioner put Respondent on notice that Petitioner was enforcing the terms of the

14 | Agreement, requiring that Respondent pay all past-due invoices in full and requiring that all future

15 | services that may be required by Respondent, including freight and services, be pre-paid.  Rather than

16 | pay what was owed, Respondent continued to make excuses as to why it could not pay the full amount

17 | owed at that time.  Respondent ultimately paid $100,000 towards the amounts owing and Petitioner

18 | cooperated in the transition of the business to the new fulfillment company, including through the

19 | delivery of the inventory and the customer database, and it processed certain remaining orders.

20 | Petitioner believed the matter was resolved as of that time.

21 |     5.    Without any further notice, on November 9, 2007, Respondent filed its Complaint,

22 | alleging that Petitioner misappropriated Respondent's trade secrets, tortiously interfered with

23 | Respondent's business, violated §1125(a)(1)(A) of the Lanham Act, engaged in deceptive and unfair

24 | trade practices and breached several provisions of the Agreement.  A true and correct copy of the

25 | Complaint is attached hereto as Exhibit "2".

26 | ///

27 | ///

28 | ///

2

1       6.    On November 28, 2007, Petitioner made a demand to Respondent to submit its claims

2  to arbitration and to dismiss its Complaint.  However, Respondent refused and continues to refuse to

3  submit its claims to arbitration pursuant to the Agreement.

4      I declare under penalty of perjury under the laws of the State of California that the foregoing is

5  true and correct.

6      Executed December 17, 2007, at Van Nuys, California.

7

8

9                     Anthony Sziklai

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28